**The STATE of Ohio, Appellee,**

v.

**THOMPSON, Appellant.**

[Cite as *State v. Thompson* (1998), 127 Ohio App.3d 511.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 72044.

Decided May 4, 1998.

**515**

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *Diane Smilanick,* Assistant Prosecuting Attorney, for appellee.

*Zukerman & Associates* and *Larry M. Zukerman,* for appellant.

MICHAEL J. CORRIGAN, Judge.

Melvin Thompson, defendant-appellant, appeals his conviction in the Cuyahoga County Court of Common Pleas, Criminal Division, of one count of aggravated burglary in violation of R.C. 2911.11, five counts of aggravated robbery in violation of R.C. 2911.01, five counts of kidnaping in violation of R.C. 2905.01, one count of rape in violation of R.C. 2907.02, and one count of felonious assault in violation R.C. 2903.11. All counts contained a firearm specification. In this appeal, appellant raises six errors for review. This court, finding no error, affirms appellant's convictions.

This case arose from an incident which took place on September 9, 1996, at the home of Mrs. Margaret Sims, who lived on Columbia Road in Cleveland, Ohio. Shortly after midnight, four masked and/or hooded males entered the premises and burglarized, robbed, and kidnaped various individuals who were present in the house. One woman was raped. Four males, including appellant, were arrested and tried together on the various criminal charges.

On November 7, 1996, appellant filed a motion to suppress the eyewitness identification. On December 9, 1996, appellant filed a motion to separate the trials. Both motions were denied by the trial court. A jury trial commenced on December 9, 1996.

At the time of the incident, Sims was living with Mr. Zebbie Robertson. Robertson testified that shortly after midnight, he was in the living room when four masked and/or hooded gunmen kicked in the front door, ordered him to lie face down on the floor, and asked him where the money was. He was then blindfolded and robbed of approximately $80.

Margaret Sims, the homeowner, was in her second-floor bedroom rolling her hair when an intruder came in carrying a handgun. She testified that he put the

gun in her face, told her to lie down with a pillow over her head, and asked where the money was. After searching the owner's room, the intruder then took her to her daughter's room and ordered her to lie down on the bed with the children. Other male intruders came into the bedroom, brandishing handguns and shotguns. Robertson was robbed of approximately $1,900 in uncashed Social Security checks.

The daughter, Quashawena, testified that she was in her bedroom using her phone when a gunman burst into her room and demanded that she put the telephone down. He then disconnected the telephone. At that time, Quashawena's sister, Janice, and nephew, Deonte, were also in the bedroom. The gunman demanded to know where her brother kept the money. When she denied any knowledge of the money, she was ordered to lie face down on the bed with the others and pull the bedding over her head. Quashawena testified that she was able to observe a second gunman carrying a shotgun enter the room. She testified that the original gunman then left the room and subsequently returned with Quashawena's mother. She identified appellant in court as the original gunman and the second gunman as Dontez White.

Edward Sims also lived with his mother, Margaret. He testified that shortly after midnight, he returned home with his girlfriend, Lakeithta Small, and her cousin, Sheri. As Edward entered the house, an intruder put a gun in his face and ordered him to the floor. He was then taken to his bedroom in the attic. A gunman ordered him to lie down on the floor facedown and asked where he kept the money. When he denied any knowledge of the money, he was beaten in the head with the gun. After the gunman left, Edward jumped out of the window and ran to telephone the police. It was later discovered that approximately $1,000 was missing from a box Edward kept near his bed in the attic.

Edward's girlfriend, Lakeithta Small, corroborated this version of events. She testified that when they entered the house, an intruder pointed a gun at them and ordered them to the floor. She noticed Robertson lying on the living room floor bound and gagged. When Edward was taken to the attic, she testified that one of the gunman took her and her cousin to the second-floor bedroom, where Margaret Sims and her daughter were being held. One gunman stayed in the bedroom while the others took Edward up into the attic. The gunman who stayed in the bedroom told her that Edward owed them $10,000 and that if they did not receive their money, they would kill all the occupants in the house. Small told the gunman that she was Edward's sister for fear of what might have happened to her if they found out that she was his girlfriend.

Small testified that she was sitting on the bed and could clearly see into the hallway because the hallway and attic lights were on. Two gunmen came down from the attic and yelled at her, "Bitch, where is your Cavalier," thinking that she

was another person. This gunman had on a heavy coat, but she could see his face and later identified him as Julius Potter. Small also identified the other gunman who came down from the attic as Dontez White.

Small then identified appellant as the third gunman to come down from the attic. She testified that he was wearing a blue Indians T-shirt, light blue-jean shorts, and white and blue tennis shoes. He grabbed her purse and took approximately $80 from it. He then took Small into another room and ordered her at gunpoint to perform fellatio. She testified that she did what he said because he had a gun to the side of her head. Appellant then ordered her to take off her shorts and pull her dress up. He then stuck his penis into her vagina, but because of her resistance, he stopped. Appellant then ordered her to again perform fellatio. Small testified that appellant put his gun down and put his penis near her face. At this point, she bit appellant's penis. A struggle ensued until a loud noise was heard. All the intruders, including appellant, ran out of the house.

Small checked on the other people in the house but did not see Edward. She then ran out to call the police at a neighbor's house, as their phone lines had previously been cut. Small saw Edward a few minutes later and testified that his face had been badly beaten.

Small went to Mt. Sinai Hospital, where she explained what had happened to her. After being given an examination, the police came, and she again explained what took place that evening. Small testified that she subsequently received some information from friends that the intruders were from the Hough area of town so she went over there to see whether she could identify any of them. Looking out of her friend's window, she identified Julius Potter walking on the street as the gunman who asked her where the Cavalier was.

Small subsequently went to the Sex Crimes Unit to identify photos of suspects. She identified appellant as the gunman who raped her and Dontez White as one of the other gunmen in the house. Small testified that Detective Essie Borders–Howard of the Sex Crimes Unit did not tell her whom to pick in the photo array.

Detective Borders–Howard subsequently contacted Small again and asked her to come down to the unit to view another photo array. Small let herself into the waiting area and saw Detective Borders–Howard and another police officer escorting a person out of the unit. Small immediately identified that individual, Julius Potter, as one of the gunmen. She further testified that Detective Borders–Howard in no way told her or suggested to her that Julius Potter was one of the suspects.

The state also called Charlie Cooper as a witness, who testified that he lived in the Hough area and was told by Julius Potter a few days before the incident that

"some niggers is out on some house shit" and that "these niggers want to rob you, but it ain't nothin because you my dude." Julius Potter also told Cooper to watch his back and that the Sims brothers had better be careful. Cooper then identified Julius Potter in court as the man with whom he had the conversation.

The state also called Detective Borders–Howard of the Sex Crimes Unit, who worked on the case. She testified that she attempted to conduct a lineup but did not have enough people with which to conduct one. Instead, Detective Borders–Howard presented a photo array that consisted of fifteen individuals, including all of the defendants. All of the witnesses viewed the photo array separately.

The detective testified that Small identified Dontez White as one of the gunman and appellant as the gunman who had raped her. She testified that Small informed her that Julius Potter was also involved in the incident and for that reason he was arrested. When the detective began questioning Julius Potter about the incident, he had a panic attack, and they had to escort him to the medical unit. As they were escorting Julius Potter out, Small was in the waiting room and stated, "That's him. That's him. That's the one at the house." The detective testified that she never told Small that Julius Potter was one of the suspects and that she was merely helping him out of the Sex Crimes Unit.

The state rested its case and defense counsel made a Crim.R. 29 motion for acquittal. The court overruled the motion except that it dismissed Counts Seven and Thirteen as to all defendants (aggravated robbery and kidnaping of Janice Sims). The trial court also dismissed the rape counts to all defendants except appellant. Appellant and the other defendants asserted their Fifth Amendment privilege against self-incrimination and chose not to testify.

On December 17, 1996, appellant was found guilty of one count of aggravated burglary, five counts of aggravated robbery, five counts of kidnaping, one count of rape, and one count of felonious assault. All counts contained a firearm specification. Appellant timely files this appeal.

Appellant states as his first assignment of error:

"I. The trial court erred to the prejudice of appellant by denying appellant's motion to suppress eyewitness identification in violation of appellant's state and federal constitutional rights to due process of law."

Appellant argues that the photo array prepared and utilized by Detective Howard was impermissibly suggestive and unreliable. Specifically, appellant argues that out of the spread of fifteen individuals, only the four defendants are close-up, single photographs as opposed to rectangular mug shots with both side and front views of the individuals. Moreover, appellant argues that the defendants' photographs were the only ones with a measuring wall as their background. Finally, appellant argues that because all four defendants were placed

in the array as opposed to being placed in an array individually, the array was impermissibly suggestive. For the following reasons, we find that the photo array was not impermissibly suggestive and that appellant's motion to suppress the identification was properly denied.

Where a witness has been confronted by a suspect before trial, that witness's identification of the suspect will be suppressed if the confrontation procedure was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances. *Manson v. Brathwaite* (1977), 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140; *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523. The defendant has the burden to show the court that the identification procedures were unnecessarily suggestive. *State v. Sims* (1984), 13 Ohio App.3d 287, 13 OBR 351, 469 N.E.2d 554.

In *State v. Halley* (1994) 93 Ohio App.3d 71, 76, 637 N.E.2d 937, 940, the court stated:

"The threshold question is whether the photo identification is impermissibly suggestive. All identification processes are inherently suggestive. Due process is violated only when the process is so impermissibly suggestive that the identification is unreliable in that there exists a substantial likelihood of irreparable misidentification."

To this end, this court held in *State v. Saddler* (Apr. 16, 1998), Cuyahoga App. No. 71747, unreported, 1998 WL 183865:

"When defendant is identified at trial following a pretrial identification by photograph, the defendant's conviction will be set aside if the photographs are 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' *Simmons v. United States* (1968), 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253. Suggestiveness depends upon several factors, including the size of the array, its manner of presentation, and its contents. *Reese v. Fulcomer* (C.A.3, 1991), 946 F.2d 247, 260. Stated otherwise, the test is 'whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit.' *Jarrett v. Headley* (C.A.2d.1986), 802 F.2d 34, 41. See, also, *State v. Barnett* (1990), 67 Ohio App.3d 760, 767, 588 N.E.2d 887, 891–892."

Finally, although the identification procedure may have contained notable flaws, this factor does not, *per se,* preclude the admissibility of the identification. *State v. Merrill* (1984), 22 Ohio App.3d 119, 121, 22 OBR 320, 322, 489 N.E.2d 1057, 1060–1061; *State v. Moody* (1978), 55 Ohio St.2d 64, 67, 9 O.O.3d 71, 72–73, 377 N.E.2d 1008, 1010–1011. Rather, the focus then shifts to reliability, *i.e.,* whether the out-of-court suggestive procedure created a very substantial likeli-

hood of misidentification. *Simmons v. United States* (1968), 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247.

In this case, only two witnesses identified appellant: Quashawena Sims and Lakeithta Small. Quashawena testified that appellant was the first gunman to come into her room, stood right in front of her bed, and asked her where the money was. When another gunman came into the room, appellant left and came back with her mother. She testified that appellant did not have anything covering his face and that he was medium size, brown-skinned, and had a low haircut. He was wearing an Indians T-shirt and blue-jean shorts. She then identified appellant in the photo array and again at trial as that individual.

Lakeithta Small testified that when she went into the house, she observed four intruders. One of the gunmen had on a T-shirt, shorts, tennis shoes, and nothing covering his face. When they were taken to the upstairs bedroom, Small was able to see in the hallway, which had the light on. She observed appellant coming down from the attic and approaching her. Small testified that he had on an Indians T-shirt, light blue-jean shorts, white and blue tennis shoes, and a low haircut. Appellant searched through her purse, took out approximately $80, and forced her into another bedroom, where he raped her. Again, Small identified appellant in the photo array and at trial.

A review of the photographs demonstrates that each of the fifteen males depicted in the array is comparable to the general descriptions given by the victims of the intruders. Moreover, Detective Howard testified that the photo array was shown to each victim at a separate time. Finally, a review of the testimony of both witnesses establishes that their identification was made objectively and without suggestion or influence by Detective Howard.

While we acknowledge that the photo array contained flaws, *i.e.*, defendants were the only single shots with a measuring-wall background, we do not find that the nature of the photo array creates a substantial likelihood of misidentification, nor do we find that it was impermissibly suggestive, *Merrill* and *Simmons*, supra, especially in light of the witnesses' corroborating description of appellant at the scene of the crime, as well as the witnesses' opportunity to see appellant's face, their degree of attention when viewing appellant, and the level of each witness's certainty. See *Neil v. Biggers* (1972), 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401, 411–412. For these reasons, the trial court did not err in denying appellant's motion to suppress. Appellant's first assignment of error is not well taken.

Appellant states as his second assignment of error:

"II. The trial court erred to the prejudice of appellant and abused its discretion by denying appellant's motion that the medical staff of Cuyahoga

County Jail conduct an examination of appellant's genitals in violation of appellant's state and federal rights to due process of law and compulsory process."

Appellant argues that the trial court abused its discretion in denying his request for an order that an impartial member of the medical staff for the county jail conduct an examination of his genitals in response to the testimony of Small, who stated that she bit his penis during the rape. Appellant argues that the trial court's denial deprived him of his rights to due process and/or compulsory process.

It is well established that pursuant to Evid.R. 104, the introduction of evidence at trial falls within the sound discretion of the trial court. *State v. Heinish* (1990), 50 Ohio St.3d 231, 553 N.E.2d 1026; *State v. Sibert* (1994), 98 Ohio App.3d 412, 648 N.E.2d 861. An abuse of discretion connotes more than an error in law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482–483, 450 N.E.2d 1140, 1142. As the Supreme Court has noted:

" 'An abuse of discretion involves far more than a difference in *** opinion. The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an "abuse" in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment, but the defiance thereof, not the exercise of reason but rather of passion or bias.' " *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 126–127, 482 N.E.2d 1248, 1251–1252, quoting *State v. Jenkins* (1984), 15 Ohio St.3d 164, 222, 15 OBR 311, 360–361, 473 N.E.2d 264, 313–314.

In support of his assertions, appellant cites *State v. Minkner* (1994), 93 Ohio App.3d 127, 637 N.E.2d 973. In that case, the Court of Appeals for Clark County held that it was an abuse of discretion for the trial court to deny the defendant's request for a physical examination of his penis to see whether it had the physical characteristics described by the alleged victim.

There, the victim alleged that the defendant's penis had features/characteristics that would indicate that he had had surgery. The appellate court noted the discrepancies in the victim's statements to the police and her testimony at trial. Additionally, the court noted that the victim's statements concerning a surgical scar took on additional significance, since it was apparent that the jury had trouble deciding whom to believe, *i.e.*, defendant was acquitted of rape but found guilty of kidnaping. For these reasons, the appellate court concluded that the denial of defendant's motion for a visual examination constituted an abuse of discretion.

In this case, we find the facts in *Minkner* to be distinguishable. In *Minkner*, there were claims of a permanent surgical scar. In this case, the victim testified only that she bit his penis. There is no way of knowing whether there would be any permanent disfigurement or characteristic resulting from the injury, given the fact that Small's testimony was approximately three months after the incident occurred. We find the probative value of such an examination to be questionable at best.

Moreover, contrary to *Minkner*, there is no evidence that the jury did not believe Small's testimony. Appellant was convicted of one count of rape. We also note that a photograph could have been taken of appellant's penis and introduced as an exhibit to rebut Small's testimony. Appellant likewise could have been the vehicle for this evidence by way of his own testimony.

While we recognize the medical records indicate Small denied biting appellant's penis during her examination, we find after a review of the record and based upon the aforementioned facts that the trial court did not abuse its discretion in denying appellant's motion for an examination of his penis. Appellant's second assignment of error is not well taken.

Appellant states as his third assignment of error:

■ "III. The trial court erred to the prejudice of appellant by instructing the jury that 'your duty is confined to the determination of guilt or innocence of the defendant' in violation of appellant's constitutional rights to a jury verdict, as guaranteed by the Sixth Amendment to the United States Constitution and Article 1, Section 10 of the Ohio Constitution and to due process of law, as guaranteed by the Fourteenth Amendment of the United States Constitution and Article 1, Section 16 of the Ohio Constitution."

Appellant argues that the trial court committed prejudicial error when it instructed the jury that "[y]our duty is confined to the determination of the guilt or innocence of the defendants and to the determination of the specifications submitted to you." Appellant argues that this instruction impermissibly shifts the burden to defendant to establish his innocence, thereby confusing the burden of proof.

■ Initially, we note that defense counsel failed to object to any perceived error in the trial court's jury charge. It is well established that absent plain error, an appellate court will not consider errors that the defendant failed to object to at the trial level. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

■ A defective jury instruction does not rise to the level of plain error unless it can be shown that the outcome of the trial would clearly have been

different but for the alleged error. *State v. Campbell* (1994), 69 Ohio St.3d 38, 630 N.E.2d 339; *Cleveland v. Buckley* (1990), 67 Ohio App.3d 799, 588 N.E.2d 912. Moreover, a single challenged jury instruction may not be reviewed piecemeal or in isolation but must be reviewed within the context of the entire charge. See *State v. Hardy* (1971), 28 Ohio St.2d 89, 57 O.O.2d 284, 276 N.E.2d 247.

In this case, the trial court did state that "the defendant must be acquitted unless the state produces evidence which convinces you beyond a reasonable doubt of every essential element of the offenses charged in the indictment." After viewing the disputed statement in the context of the overall jury charge, we find that the trial court did not commit plain error. See *State v. Cotton* (July 14, 1994), Cuyahoga App. Nos. 64361 and 64378, unreported, 1994 WL 372553. Appellant's third assignment of error is not well taken.

■ Appellant states as his fourth assignment of error:

"IV. The trial court erred in denying appellant's Criminal Rule 14 motion for separate trials, in that appellant was substantially prejudiced by the joinder of trials with the other co–defendants in violation of appellant's state and federal constitutional rights to due process of law, jury trial and compulsory process."

■ Joinder of defendants and the avoidance of multiple trials is favored in the law because joinder "conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries." *State v. Thomas* (1980), 61 Ohio St.2d 223, 225, 15 O.O.3d 234, 236, 400 N.E.2d 401, 404.

R.C. 2945.13 states:

"When two or more persons are jointly indicted for a felony, except a capital offense, they shall be tried jointly unless the court, for good cause shown on application therefor by the prosecuting attorney or one or more of said defendants, orders one or more of said defendants to be tried separately."

■ Whether an accused shall be tried separately is a matter within the discretion of the trial court. *State v. Abbott* (1949), 152 Ohio St. 228, 40 O.O. 282, 89 N.E.2d 147. Joinder is the rule rather than the exception, and the burden was upon appellant to show good cause why the separate trial should be granted and that the trial court abused its discretion in refusing to do so. *State v. Perod* (1968), 15 Ohio App.2d 115, 44 O.O.2d 249, 239 N.E.2d 100. Further, a defendant asserting that joinder is improper must make an affirmative showing that his rights will be prejudiced. *State v. Roberts* (1980), 62 Ohio St.2d 170, 16 O.O.3d

201, 405 N.E.2d 247. See, also, *State v. Robles* (1989), 65 Ohio App.3d 104, 583 N.E.2d 318.

In this case, appellant argues that the trial court committed prejudicial error by failing to grant his motion for a separate trial in violation of Crim.R. 14, which states:

"If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires."

Specifically, appellant argues that he was denied the opportunity to raise antagonistic defenses that would exculpate himself and incriminate his co-defendants. He argues that he intended to assert an alibi defense and sought to use the codefendant's testimony to show that he was not present at the scene of the crime. Since codefendants Julius Potter and Dontez White did not assert an alibi defense, their defenses and appellant's defense would necessarily be antagonistic. See *State v. Daniels* (1993), 92 Ohio App.3d 473, 636 N.E.2d 336. We disagree.

In *Zafiro v. United States* (1993), 506 U.S. 534, 538–539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317, 325, the United States Supreme Court was confronted with the issue of severance when there exist mutually antagonistic defenses. The court, in interpreting Fed.R.Crim.P. 14, which is analogous to Ohio's Crim.R. 14, stated:

"Mutually antagonistic defenses are not prejudicial *per se*. Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's discretion.

"* * *The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in *Richardson v. Marsh* [ (1987), 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176], less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." (Citations omitted.)

In this case, not only does appellant fail to demonstrate in any manner that Julius Potter and Dontez White would have provided testimony favorable to appellant's alibi defense, but the three defendants did, in fact, present alibi defenses. However, the jury chose to believe the testimony and identifications of the victims, including Small, who testified in detail that appellant was one of the gunman who broke into their house and who testified that appellant was the gunman who raped her. Moreover, the trial court gave the proper instructions relating to multiple defendants and instructed the jury that they had to decide

separately the question of guilt or nonguilt of each of the defendants, thereby curing any risk of prejudice.

Appellant has failed to meet his burden in establishing good cause why the defendants' trials should have been separated and that the trial court abused its discretion in denying his motion for separate trials. Appellant's fourth assignment of error is not well taken.

Appellant states as his fifth assignment of error:

"V. The trial court erred as a matter of law and to the prejudice of appellant by denying appellant's motion for judgment of acquittal as to all counts of the indictment pursuant to Crim.R. 29(A) in violation of appellant's right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Constitution of the state of Ohio."

Appellant argues that the trial court committed prejudicial error in denying his Crim.R. 29(A) motion for acquittal on all counts. Specifically, appellant argues that out of the five testifying witnesses, only two identified appellant. These two identifications were highly unreliable and are insufficient to support his conviction.

Under Crim.R. 29, a trial court "shall not order an entry of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus. "A motion for judgment of acquittal under Crim.R. 29(A) should be granted only where reasonable minds could not fail to find reasonable doubt." *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 23, 514 N.E.2d 394, 399.

Therefore, the test an appellate court must apply when reviewing a challenge based on a denial of a motion for acquittal is the same as in reviewing a challenge based upon on the sufficiency of the evidence to support a conviction. See *State v. Bell* (May 26, 1994), Cuyahoga App. No. 65356, unreported, 1994 WL 236228. In *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, the Ohio Supreme Court re-examined the standard of review to be applied by an appellate court when reviewing a claim of insufficient evidence.

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia* [1979], 443 U.S. 307, 99 S.Ct.

2781, 61 L.Ed.2d 560, followed.).” *State v. Jenks, supra,* paragraph two of the syllabus.

More recently, in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546–547, the Ohio State Supreme Court stated the following with regard to the “sufficiency” as opposed to the “manifest weight” of the evidence:

“With respect to sufficiency of the evidence, ‘sufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.’ Black’s Law Dictionary (6 Ed.1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain the conviction). In essence, sufficient is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.”

Appellant was convicted of the following:

One count of aggravated burglary in violation of R.C. 2911.11 (with firearm specification), which provides in part:

“(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

“* * *

“(2) The offender has a deadly weapon or dangerous ordinance on or about the offender’s person or under the offender’s control.”

Five counts of aggravated robbery in violation of R.C. 2911.01 (with firearm specification), which provides in part:

“(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt of the offense, shall do any of the following:

“(1) Have a deadly weapon on or about the offender’s person or under the offender’s control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]”

Five counts of kidnaping in violation of R.C. 2905.01 (with firearm specification), which states in part:

"(A) No person, without privilege to do so, shall knowingly do any of the following:

"(1) By force or threat, remove another person from the place where the other person is found;

"(2) By force or threat, restrain the liberty of another person, under the circumstances which create a risk of physical harm to the victim, or place the other person in fear[.]"

One count of rape in violation of R.C. 2907.02 (with firearm specification), which states in part:

"(2) No person shall engage in sexual conduct with another person when the offender purposely compels the other person to submit by force or threat of force."

One count of felonious assault (with firearm specification) in violation of R.C. 2903.11, which states in part:

"(A) No person shall knowingly:

"* * *

"(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code."

In this case, the jury was presented with the testimony of several victims. Two of the victims identified appellant as one of the individuals who had forcefully entered the home of Simms carrying a gun. Both testified that appellant was wearing an Indians T-shirt, light blue-jean shorts, and tennis shoes. Both testified that appellant's face was not covered.

The victims testified that approximately $3,000 was taken by force and/or the threat of force. The victims testified that they were held against their will. One of the victims was hit in the head with the butt of a gun. Moreover, Small testified that appellant took her into another bedroom and, with a gun in his hand, ordered her to perform fellatio. She also testified that he subsequently stuck his penis inside her vagina.

After reviewing the entire record and viewing the evidence in light most favorable to the prosecution, we find that any reasonable trier of fact could have found that all the essential elements of aggravated burglary, aggravated robbery,

kidnaping, rape and felonious assault, as charged (along with the firearm specifications) were proved beyond a reasonable doubt.

For this reason, appellant's conviction is not based upon insufficient evidence. Accordingly, the trial court did not err in denying his Crim.R. 29 motion for acquittal. Appellant's fifth assignment of error is not well taken.

▮ Appellant's sixth assignment of error states:

"VI. The judgments of conviction are against the manifest weight of the evidence in violation of appellant's right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article 1, Section 16 of the Ohio Constitution."

Appellant argues that his conviction was against the manifest weight of the evidence. Specifically, appellant argues that the only police work involved in the matter was in presenting an impermissibly suggestive photo array. When this evidence and the conflicting testimony offered by the witnesses is weighed against the testimony of appellant's fiancée, who testified that he was with her the entire night and early morning, appellant argues that it is clear that the jury lost its way and created a miscarriage of justice.

▮ Section 3(B)(3), Article IV of the Ohio Constitution authorizes appellate courts to assess the weight of the evidence independently of the fact-finder. Thus, when a claim is assigned concerning the manifest weight of the evidence, an appellate court "has the authority and the duty to weigh the evidence and determine whether the findings of * * * the trier of fact were so against the weight of the evidence as to require a reversal and a remanding of the case for retrial." *State ex rel. Squire v. Cleveland* (1948), 150 Ohio St. 303, 345, 38 O.O. 161, 177, 82 N.E.2d 709, 729.

The standard employed when reviewing a claim based upon the weight of the evidence is not the same standard to be used when considering a claim based upon the sufficiency of the evidence. The United States Supreme Court recognized these distinctions in *Tibbs v. Florida* (1982), 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652, where the court held that unlike a reversal based upon the insufficiency of the evidence, an appellate court's disagreement with the jurors' weighing of the evidence does not require the special deference accorded verdicts of acquittal, *i.e.*, invocation of the Double Jeopardy Clause as a bar to relitigation. *Id.* at 42, 102 S.Ct. at 2218–2219, 72 L.Ed.2d at 662. See, also, *Thompkins, supra.*

Upon application of the standards enunciated in *Tibbs*, the court in *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717, has set forth the

proper test to be utilized when addressing the issue of manifest weight of the evidence. The *Martin* court stated:

"There being sufficient evidence to support the conviction as a matter of law, we next consider the claim that the judgment was against the manifest weight of the evidence. Here, the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

Moreover, it is important to note that the weight of the evidence and the credibility of the witnesses are issues *primarily for the trier of fact. State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. The fact-finder, being the jury (*in this case*) or the trial judge (*in a waiver*), occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness's reaction to exhibits and the like. Determining credibility from a sterile transcript is a herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.

As previously discussed in our factual recitation of the case and our disposition of appellant's fifth assignment of error, we find that after a review of the record, there exists sufficient credible evidence supporting appellant's conviction. Accordingly, appellant's sixth assignment error is not well taken.

*Judgment affirmed.*

DYKE, P.J., and PATTON, J., concur.