[Cite as *In re Williams*, 2011-Ohio-4338.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

**IN THE MATTER OF:**

    **HANK WILLIAMS,**                     **CASE NO. 9-10-64**

**ALLEGED DELINQUENT CHILD,**

**[HANK WILLIAMS -**               **O P I N I O N**
      **APPELLANT].**

Appeal from Marion County Common Pleas Court
Juvenile Division
Trial Court No. 2009 DL 0558

**Judgment Affirmed**

**Date of Decision: August 29, 2011**

**APPEARANCES:**

    *Robert E. Wilson* **for Appellant**

    *Brent W. Yager and Gregory A. Perry* **for Appellee**

**WILLAMOWSKI, J**.

{**¶1**} Defendant-Appellant, Hank Williams ("Appellant" or "Hank"), appeals the judgment of the Marion County Court of Common Pleas, Juvenile Division, adjudicating him a delinquent child for having committed complicity to aggravated vehicular homicide and vehicular assault. On appeal, Appellant contends that the trial court erred in that liability cannot attach as an aider or abettor when the passengers were willing participants; that the trial court erred in failing to grant Appellant's motion for acquittal; and that the trial court's findings were against the manifest weight of the evidence. For the reasons set forth below, the judgment is affirmed.

{**¶2**} On February 4, 2010, a complaint was filed alleging Appellant was a delinquent child on one count of complicity to aggravated vehicular homicide and one count of complicity to aggravated vehicular assault, in violation of R.C. 2903.06(A) and R.C. 2903.08(A) respectively, felonies of the third and fourth degrees if committed by an adult. Both offenses were filed as delinquency counts pursuant to R.C. 2152.02(F). The Marion County Grand Jury had originally returned an indictment on June 12, 2009, charging Appellant with the above two counts and specifying that Appellant was age-eligible to be determined a serious youthful offender. Appellant was born on December 1, 1990, making him just a few weeks less then eighteen years of age at the time of the accident, and nineteen

years of age during most of the proceedings and at the time of the trial. The State later dismissed the indictment and filed the complaint, which contained the same charges but without the serious youthful offender specification.

{¶3} The complaint arose from an accident that occurred on November 6, 2008, when a group of teenagers/young adults were racing their cars on Holland Road, an area known by locals as a good, secluded place to race cars. The driver of one of the cars, Hali Gibson ("Hali"), was trying to pass Appellant's car at a high rate of speed when she lost control of her vehicle. Her 2000 silver Mitsubishi Eclipse went off the road and hit a tree, killing her right front passenger, Brandon Nelson ("Brandon"), and seriously injuring her back seat passenger, Montana Roose ("Montana").

{¶4} A three-day bench trial was held on February 23, 24, and 25, 2010. The State presented the testimony of fourteen witnesses, including all of the surviving youths who were riding in the vehicles; a neighbor who testified that she saw and heard the cars racing; several officers who responded or investigated the accident; and an accident reconstruction expert. Appellant testified on his own behalf.

{¶5} The State's witnesses testified that around 7:30 to 8:00 on the evening of the accident, Appellant and his friend, Raymond Worthington ("Ray"), drove to the BlueFusion, a bowling alley/game room that is a popular hangout. Appellant

drove Ray and himself there in his 1996 blue Eclipse. Shortly thereafter, Hali and Brandon arrived and began to talk with Appellant and Ray. A little later, Kyle Smith ("Kyle") came with three of his friends, Cody Chapman ("Cody C."), Cody Kelly ("Cody K.), and Montana, and they joined the others. All eight were interested in cars and the conversation was about cars and which cars were the fastest. Kyle had recently acquired his 1994 white Honda Civic, which had Lamborghini-type doors, blue neon undercarriage lights, and a new sound system. The group then left the building and went to the parking lot to look at Kyle's car. The conversation about cars continued and there was speculation and teasing as to whether Hali's or Appellant's Eclipse was the fastest. The teens then got into the three cars they had come in and left the BlueFusion. Most of the State's witnesses testified that it was agreed or understood that they would be going to Holland Road to race or "mess around" to see whose car was the fastest. As they were leaving the parking lot, Kyle and Appellant peeled their tires and did a "burnout."[1]

{¶6} A few minutes later, a gearshift cable came loose in Appellant's car and he and Ray pushed it to the side of the road. The other two vehicles also pulled over and waited while Appellant repaired his shift, and then the group

---

[1] Major Aaron Corwin of the Marion County Sheriff's Department was doing private, plain clothes security duty in the parking lot and stopped Kyle and gave him a warning. He also tried to stop Appellant, but Appellant either didn't notice or he ignored Major Corwin and kept going. Major Corwin put out a call to the sheriff's department to be on the lookout for Appellant's blue Eclipse. Shortly thereafter, at 8:55 p.m. when Appellant was on the side of the road repairing his car, Deputy Kevin Jolliff saw Appellant and gave him a ticket for reckless driving for the burnout in the parking lot.

headed out again together. At some point, they all pulled into MotorMart together and Montana switched cars. Montana got into Hali's car in the backseat to equalize the weight between cars. Kyle testified that Montana wanted to ride in Hali's car because he thought it was faster. The group headed to Holland Road, with Kyle driving his white Civic with Cody C. and Cody K. as passengers; Hali driving her silver Eclipse, with Brandon and Montana as passengers; and Appellant driving his blue Eclipse, with Ray as his passenger.

{¶7} Sometime around 9:30 p.m., they arrived at Holland Road. Kyle was leading the group, followed by Hali, but then Appellant passed both vehicles. After this first pass, they all turned around and headed back towards the straightaway section of the road that is commonly used for racing.

{¶8} At this point, the three[2] cars were driving single file, with Kyle in front, and Hali and Appellant following. Kyle testified that he was traveling around 60-70 miles per hour ("mph"), but that he wasn't involved in the race because his white Civic was not very fast and they were going to see which Eclipse, Hali's or Appellant's, was the fastest. Kyle, and several of the State's other witnesses testified that Appellant passed both Hali and Kyle going

---

[2] On the way to Holland Road, a fourth vehicle, a yellow Honda that they all knew to be a "really fast" car, joined the group. Cody C. recognized the car and told Kyle to flash his lights at it, which was a signal for racing. The yellow Honda joined the group on Holland Road but, before the accident, the yellow Honda "took off" and sped past all three of the other vehicles early on and went on its way. The driver of the yellow Honda was not involved in the trial.

approximately 100 mph, and then returned to the right-hand lane. Then, Hali also passed Kyle going at least 100 mph, but she remained in the left lane trying to pass Appellant. The State's witnesses testified that the two Eclipses were both traveling side-by-side at approximately 100 mph or more when Hali's car bumped or brushed Appellant's car, transferring streaks of silver and blue paint onto each other's cars. Hali then lost control and went off the road, through a farm field, and hit a large tree. The accident reconstruction expert testified that she was traveling at 98 to 110 mph per hour at the time of the crash, and possibly even faster. (Tr. at p. 713-714.)

{¶9} Appellant parked his car and he and Ray ran to the scene of the crash. All three of the occupants were knocked unconscious at first, but then Hali came to and Appellant and Ray helped to pull her out. Montana was in the backseat and was moving and moaning, but he was stuck and they couldn't extract him. Brandon was not moving and it was evident that he was seriously injured. Kyle also arrived there and dropped off Cody C. and Cody K. However, Kyle was frightened and drove away, but he returned to the crash site shortly thereafter.

{¶10} After helping Hali out of the car, Appellant and Ray hurriedly left the scene before the first responders arrived. Appellant claimed that he was scared and that he also left because Ray was on probation and would have been in trouble for being out past his curfew. Cody K. called 9-1-1 and the EMS and police

arrived. The jaws of life were used to extract Brandon and Montana and the three injured teens were taken to the hospital. Brandon, who was fifteen years old, died the following day. Montana had a severe head injury and it took him several months to recover. Hali was released from the hospital the next day.

{¶11} Appellant's testimony generally agreed with the State's witnesses' rendition of the events that occurred. However, he adamantly claimed that he was not in any way involved in racing and had no knowledge that anyone was planning to race. Appellant testified that he did not go to the parking lot with the other seven, but that he remained in the BlueFusion and went to the bathroom. By the time he went to the parking lot, he claimed that many of the others were already in their respective cars and ready to leave. He testified that he never heard any discussion about racing and that he never agreed to race. He did acknowledge that he was being teased about his car being slower than Hali's, but insisted that he would never agree to race her because he already knew her car was faster because it was newer and had a bigger engine. Appellant acknowledged that Hali and Brandon were always challenging him to race, but he claimed he wouldn't race because he believed his car was "junk" compared to her car.

{¶12} Appellant also claimed that he never intended to go to Holland Road, but that Hali had just said they were going to "ride around" when they left the BlueFusion. After his car broke down, he spoke with his father, who told him to

come home. He testified that he was on his way home when they got a call that everyone was going to meet at MotorMart and then "ride around." Appellant claims he wanted to go home but that Raymond talked him into going with the group. After meeting at MotorMart, they followed the others and then turned onto Holland Road.

{¶13} Appellant testified that he wasn't sure what they were doing and he was not familiar with Holland Road, but that he turned around when the other cars did. Kyle and Hali were driving in front of Appellant and were driving slowly, about 40 mph (Holland Road's speed limit is 50 mph), so he put on his turn signal and passed Hali and then Kyle, before returning to his lane in front of Kyle. He testified that he saw Hali's headlights behind him passing Kyle, and then her car flew past him like he was sitting still. Appellant estimated he was traveling between 50-60 mph when she passed him, traveling at more than 100 mph. He believed that she was about five car lengths in front of him when he saw her car fishtailing and she went off the road. He was not aware that their cars had made contact until he got home and saw the paint.

{¶14} After hearing all of the testimony, the trial court took the matter under advisement. On March 24, 2010, the trial court filed its decision, adjudicating Appellant as a delinquent child for having committed complicity to aggravated vehicular homicide and vehicular assault. After a dispositional

hearing, on July 23, 2010, the trial court filed its judgment entry giving Appellant a suspended commitment to the Department of Youth Services and placing him on probation. He further ordered that Appellant serve ninety days in the Multi-County Correctional Center, with fifty-eight days suspended provided he complied with all the orders and conditions imposed by the court, including community service, attendance at Saving Teen Lives Classes, writing letters of apology, payment of a fine, and payment of restitution to the victims' families.[3]

{¶15} Appellant timely appealed but this Court dismissed the appeal on September 29, 2010, for lack of jurisdiction. The judgment entry was not a final appealable order because the issue of restitution remained to be determined and a final amount was not specified. On November 29, 2010, the trial court ordered Appellant to pay restitution of one-half of Brandon's burial expenses in the amount of $2,398.81. Appellant now brings this appeal, raising the following three assignments of error for our review.

**First Assignment of Error**

> **Criminal liability cannot attach to an aider and abettor of a principal offender where the principal offender causes the death of one passenger and serious physical injury to another passenger if the passengers were willing participants in the criminal conduct.**

---

[3] Appellant was ordered to serve certain specific dates in 24-hour increments, including holidays (Thanksgiving, Christmas, Easter, Fourth of July, etc.), the anniversary date of the crash, Montana's birthdates, Brandon's birthdates, and what would have been Brandon's graduation date.

**Second Assignment of Error**

**The trial court erred in failing to grant alleged delinquent child, Hank Williams' motion for acquittal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure.**

**Third Assignment of Error**

**The judgment of the trial court finding alleged delinquent child Hank Williams guilty of complicity to aggravated vehicular homicide and complicity to vehicular assault are contrary to the manifest weight of the evidence.**

{¶16} In order to facilitate our review, we shall address the assignments of error out of order. In the second assignment of error, Appellant asserts that the trial court erred by failing to grant his Crim.R. 29(A) motion for acquittal. Specifically, Appellant alleges that the State failed to establish the elements to prove that Appellant in any way aided or abetted Hali in causing the death of Brandon and serious injury to Montana.

{¶17} Crim.R. 29(A) requires the court to enter a judgment of acquittal if the evidence is insufficient to sustain a conviction of the offenses. In reviewing a Crim.R. 29(A) motion for acquittal, the "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Williams*, 74 Ohio St.3d 569, 1996-Ohio-91, 660 N.E.2d 724,

quoting *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶18} Pursuant to Juvenile Rule 29(E)(4) and R.C. 2151.35(A), a trial court may find a juvenile delinquent when the evidence demonstrates beyond a reasonable doubt that the child committed an act which would have constituted a crime if committed by an adult. Therefore, the State was required to prove that Appellant was guilty of complicity to aggravated vehicular homicide and complicity to aggravated vehicular assault. The statute for Aggravated Vehicular Homicide, R.C. 2903.06, states that:

> **(A) No person, while operating or participating in the operation of a motor vehicle * * * shall recklessly cause the death of another.**
>
> **(B) Whoever violates this section is guilty of aggravated vehicular homicide, an aggravated felony of the third degree.**

Similarly, R.C. 2903.08, Aggravated Vehicular Assault, provides that: "No person, while operating or participating in the operation of a motor vehicle * * * shall recklessly cause serious physical harm to another person." A person acts "recklessly" when "with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). Hali recklessly operated a motor vehicle, which proximately caused the death of Brandon and serious

physical harm to Montana.[4] Appellant was convicted of complicity for aiding and abetting Hali in committing those offenses.

{¶19} The complicity statute, R.C. 2923.03(A) provides, in pertinent part:

**No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:**

**\* \* \***

**(2) Aid or abet another in committing the offense.**

{¶20} To "aid and abet" is "'[t]o assist or facilitate the commission of a crime, or to promote its accomplishment.'" *State v. Johnson*, 93 Ohio St.3d 240, 243, 2001-Ohio-1336, 754 N.E.2d 796, quoting BLACK'S LAW DICTIONARY (7th Ed.1999) 69. A conviction for complicity by aiding and abetting is shown by evidence demonstrating that a defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." Id. at the syllabus. Evidence of aiding and abetting may be shown by either direct or circumstantial evidence, and the sharing in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed. *State v. Lett*, 160 Ohio App.3d 46, 2005-Ohio-1308, 825 N.E.2d 1158, ¶29.

---

[4] Hali, who was eighteen at the time of the accident, pled guilty as an adult and was awaiting sentencing at the time of the trial.

{¶21} Hali, Montana, Kyle, Cody C., and Cody K. all testified that everyone was going to Holland Road for the purpose of racing, to see whose car was faster. Several testified that it was going to be Hali and Appellant who were racing in order to see which Eclipse was the faster. Although Ray testified that he and Appellant were only planning to "watch," even he acknowledged that everyone knew that they were going to Holland Road to race. For example, Cody K. testified that:

> **Q. If everybody's going there to race, they're going from bridge to bridge?**
>
> **A. Yes.**
>
> **Q. Is that what happened? Was there ever a race?**
>
> **A. Yes.**
>
> **Q. And who was the race between?**
>
> **A. Hank and Hali.**

(Tr. p. 329.) Appellant was the only person who claimed he had no idea that any racing was planned or that any racing occurred that evening.

{¶22} And, contrary to Appellant's testimony that he was only going 50-60 mph, all of the State's witnesses testified that *both* Hali and Appellant were traveling side-by-side at a high rate of speed, racing each other. Kyle testified that he was traveling around 60-70 mph when Appellant and then Hali passed him,

each traveling about 100 mph. (Tr. p. 129-130.) Kyle testified that Hali was never able to get in front of Appellant's vehicle. (Tr. p. 199.) Cody C. testified that both Hali and Appellant were traveling at about 115-120 when he saw their cars touch and she went off the road. (Tr. p. 220.) He said that he saw their cars brush, just hard enough for Hali to lose control. (Tr. p. 216.) Cody K. testified that he was in Kyle's car traveling about 60 mph when he saw Hank and then Hali pass him going much faster and then, "[t]hey started racing and just a little bit past the white house is where Hali lost control * * *." (Tr. p. 287-88.)

{¶23} Montana, who was riding with Hali, testified that Kyle was "going slow" (around 60 or 70), and that Appellant and Hali both passed them going around 90 to 100 when the two cars "swiped" and then wrecked. (Tr. p. 351.) It was his perception that the vehicles were racing, and he did not remember either car trying to slow down before the crash. (Tr. p. 352-54.) Hali suffered some memory loss concerning the accident, but she believed she was going 80 or 90 when she was trying to speed up and pass Appellant after he had passed her, and that they were traveling at the same speed. (Tr. p. 423.) She testified that she was next to Appellant when their cars bumped and she went off the road. (Tr. p. 452.)

{¶24} In addition to the participants' testimony, Deborah Russell, a resident on Holland Road, testified to hearing the "racers" revving their engines, and seeing them turn around (several used her driveway) and race at a high rate of

-14-

speed on Holland Road. She has lived on Holland Road for many years, and the action of the vehicles on the night of November 6th was consistent with the racing that she had become accustomed to seeing and hearing from her home.

{¶25} Contrary to Appellant's claim that he was merely "at the wrong place at the wrong time," there was ample evidence in the record to show that Appellant was an active co-participant in racing with Hali. Viewing the evidence in a light most favorable to the prosecution, we find that there was sufficient evidence of all of the required elements of the charges to support the trial court's denial of Appellant's motion for acquittal. Appellant's second assignment of error is overruled.

{¶26} In his third assignment of error, Appellant alleges that the decision was against the manifest weight of the evidence because the State's witnesses were not credible and admitted that they had lied to authorities during the investigation. Furthermore, he claims that none of the witnesses ever testified that Hank and Hali were going to race or that Appellant in any way aided and abetted Hali.

{¶27} When determining whether a trial court's delinquency adjudication is against the manifest weight of the evidence, this Court employs the same standard of review applicable to criminal convictions claimed to be against the manifest weight of the evidence. See *In re Clark*, 4th Dist. No. 04CA588, 2004-Ohio-3851,

¶15. A challenge to a conviction based on the manifest weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*" (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Only if we conclude that the trier of fact clearly lost its way in resolving conflicts in evidence and created a manifest miscarriage of justice will we reverse the conviction and order a new trial. Id.

{¶28} Although the appellate court acts as a "thirteenth juror" in reviewing all of the evidence, it still must give due deference to the findings made by the fact-finder. *State v. Thompson* (1998), 127 Ohio App.3d 511, 529, 713 N.E.2d 456.

> **The fact-finder, being the jury, occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness' reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.**

Id.

{¶29} As discussed above, all of the State's witnesses who were present that evening, with the exception of one, testified that it was the group's intention to go to Holland Road to race and that Appellant and Hali were racing each other, side-by-side at a high rate of speed, when the accident occurred. Appellant's friend and passenger, Ray, was the only person (besides Appellant himself) who testified that Appellant was traveling at "only" 60-65 mph when Hali passed them like they were "sitting still." (Tr. p. 499.) However, the State declared Ray to be a hostile witness and used his June 10, 2009 grand jury testimony to impeach him. At that time, Ray had testified that Appellant was participating in a race and he was traveling in excess of 100 miles an hour. (Tr. p. 507-510.) The State read part of Ray's grand jury testimony pertaining to when he was riding with Appellant:[5]

> **Answer: Yeah, see when we come around the corner, [Appellant] chomped it down and he said he was getting in front of all them, and he chomped it down, just kept it down until we got past and when we looked back, you could see the cars and they were way back there. \* \* \***

> **Question: When you heard – when you say he "chomped it down," how fast do you think he was going?**

---

[5] Because Ray could neither read nor write, the court took a recess while the bailiff read Ray's grand jury testimony to him. The State then proceeded to question him concerning certain statements that he had made to the grand jury that were inconsistent with his trial testimony. Ray claimed he told a different story before because he was "intimidated" and felt he was being "bullied around." (Tr. at p. 538.)

**Answer:** **I'd say we was doing about 110 that night.** * * *

(Tr. p. 515-516, 537.)   The grand jury testimony also included Ray's testimony that:

> **[Appellant] kept saying he wasn't going to race, but then some – somebody else said that they would race [Hali] and we all went out there, and [Appellant] told me that we was going out there to watch,** *which I knew we wasn't going out there only to watch.*

(Emphasis added.) (Tr. p. 525.)

{¶30} The trial court found that the intention to proceed to Holland Road to race was corroborated by the testimony of all of the other vehicle occupants "with only Hank Williams indicating he had no knowledge or intention to race." (J.E., p. 3.)   The evidence overwhelmingly indicated that Appellant was racing Hali when their vehicles touched or bumped, and Hali went off the road and crashed.

{¶31} Appellant asserts that the State's witnesses were not credible because they were "admitted liars" and all had changed their stories.   Therefore, their testimony should not be given any weight or credibility.

{¶32} When the accident first occurred, Kyle and Cody C. and Cody K. originally told the officer and the 9-1-1 dispatcher that they had "just happened upon" the scene of the accident and denied that they had witnessed the crash. However, the boys testified that they only said this because they were scared and upset at the time, and were afraid of getting into trouble.   When they were

questioned by the state highway patrol a few days later, knowing that Brandon had died and the seriousness of the situation, they testified that they told the complete truth about what had happened, starting from meeting at the BlueFusion and ending on Holland Road. After the initial misrepresentation in the immediate aftermath of the accident, their stories remained consistent and believable.

{¶33} Hali testified that she provided a written statement when she was in the hospital but did not remember what she had told them. She acknowledged that if that statement claimed that she was only going 60 mph at the time of the crash, then it was not true. Montana was hospitalized with brain injuries and never spoke to the investigators.

{¶34} Upon our review of the entire record, we do not find that the trier of fact lost its way and created a manifest miscarriage of justice, nor does the evidence weigh heavily against conviction. Appellant's third assignment of error claiming that the decision was against the manifest weight of the evidence is overruled.

{¶35} Returning to the first assignment of error, Appellant claims he cannot be held responsible for complicity because he had never agreed to race and he had no knowledge of the principal offender's (Hali's) intention to race. Furthermore, even if Appellant did aid and abet the principal offender, he claims that no criminal liability can attach to him because the victims were voluntary and willing

participants in the conduct. Appellant cites to a 1979 Cuyahoga County trial court opinion in support of his claims. See *State v. Uhler* (1979), 61 Ohio Misc. 37, 402 N.E.2d 556.

{¶36} First, we find that it is irrelevant as to whether or not Appellant ever "agreed" to race beforehand; the evidence clearly supports the finding that racing had been discussed and, at some point, he made the decision to race and was actively racing Hali at the time of the accident. See *In re Clark*, 2004-Ohio-3851 at ¶43 (not necessary to show an explicit agreement to race or a violation of the street racing statute to support a complicity to aggravated vehicular homicide conviction.) Furthermore, Appellant's claim that he had no knowledge of Hali's intention to race was not supported by the testimony of the other witnesses.

{¶37} We also find Appellant's reliance on *State v. Uhler* is misplaced. This 1979 lower court case, which holds no precedential authority for this Court, is factually distinguishable from the case before this court; it has not been followed by any other Ohio jurisdictions; and, the case does not accurately reflect the current state of the law applicable to this case. The trial court in *Uhler* held that the survivor of a drag race cannot be charged with aggravated vehicular homicide for the death of the other voluntary participant, absent any contact between the vehicles. 61 Ohio Misc. at 41. In *Uhler*, the victim and defendant were each driving their own vehicles home, after spending the evening drinking

together, when they impulsively agreed to a drag race. Both vehicles ended up going off the road (without having had any contact with each other), but the victim's car hit a tree, resulting in his death. The defendant was charged with aggravated vehicular homicide, not complicity.

{¶38} We find that the legal reasoning in a recent appellate case, with facts almost identical to those in this case, is applicable. The Fourth District Court of Appeals held that the evidence was sufficient to find that the defendant minor driver was delinquent for committing complicity to aggravated vehicular homicide, arising out of the death of a passenger in the vehicle that he was racing. See *In re Clark*, supra, 2004-Ohio-3851. In *Clark*, the defendant and the driver of the other vehicle in which the victim was riding, were actively participating with each other in driving their vehicles at excessive speed (over 100 mph). Id. at ¶43. When the driver of the other vehicle attempted to pass the defendant, he lost control of the vehicle, resulting in the death of his passenger. Id. at ¶5. The Fourth District Court of Appeals found that each driver should be charged with knowledge that such conduct has a high likelihood of resulting in serious injury or death, and that such conduct exhibits a heedless indifference to the consequences, showing that both drivers perversely disregarded a known risk. Id. at ¶43; see, also, R.C. 2901.22(C). The court of appeals upheld the trial court's finding that the defendant "operated his vehicle 'in a criminally reckless manner * * * and in

so doing supported, assisted, encouraged[d], cooperated, and, aided and abetted [the other driver] in reckless operation of a vehicle that resulted in the death of [the victim].'" Id. at ¶6.

{¶39} Similarly, the Tenth District Court of Appeals found that there was sufficient evidence to support a finding that the deaths of two victims were the proximate result of the defendant's actions of participating in a street race:

> **The direct, normal, and reasonably foreseeable consequences of a drag race is that contact can occur between two vehicles, which contact at such a high rate of speed can cause one of the drivers to lose control of their vehicle. It is also reasonable to conclude that there is a high likelihood that when a driver loses control of a vehicle while traveling 80 to 100 MPH, the occupants in that vehicle, as well as others in the immediate vicinity, may suffer injuries severe enough to cause death.**

*State v. Buterbaugh* (Sept. 16, 1999), 10th Dist. No. 98AP-1093, 1999 WL 717268, 7-8.

{¶40} The facts in the *Clark* and *Buterbaugh* cases are very similar to the facts and circumstances in this case, and the findings are applicable here. Furthermore, there is nothing in the statutes for complicity, or for aggravated vehicular homicide and assault, that exempts a person from criminal liability for the death of another willing participant. As was the case in *Clark*, criminal liability can be imposed for death or injury to passengers in the other driver's vehicle.

**{¶41}** The Ohio General Assembly has imposed criminal liability in certain situations where an underlying criminal offense – in this case, the reckless operation of a motor vehicle – is the proximate cause of the death of a victim, regardless of whether the victim was an intended victim, an innocent bystander, or one of the wrongdoers themselves. See, e.g., R.C. 2903.02(b) (felony murder); R.C. 2903.04 (involuntary manslaughter); and R.C. 2903.06 (aggravated vehicular homicide).[6] Based upon the proximate cause theory of criminal liability in these types of homicides, the victim's identity or status as a comparative wrongdoer does not matter as long as the victim's death proximately results from the commission of the underlying offense. See, e.g., *State v. Filchock*, 166 Ohio App.3d 611, 2006-Ohio-2242, 852 N.E.2d 759 ("the alleged contributory negligence of a victim may not be used as a defense in a subsequent aggravated vehicular homicide prosecution unless it is the sole proximate cause of death"); *State v. Dixon*, 2nd Dist. No. 18582, 2002-Ohio-541 (defendant could be convicted of felony murder for death of his accomplice even though his accomplice was a willing participant in the commission of an armed robbery).

**{¶42}** Hali was criminally responsible because her reckless operation of her motor vehicle proximately resulted in the death and injuries of the victims.

---

[6] In each of these offenses, criminal liability is based upon the offender committing an underlying criminal offense (a violent F1 or F2 for felony murder; any felony for involuntary manslaughter; and certain traffic offenses for aggravated vehicular homicide) that proximately results in the death of another person.

Appellant is criminally responsible because he aided and abetted Hali in her criminal behavior by recklessly participating in a race with her, at a high rate of speed, on a narrow country road. Appellant's first assignment of error is overruled.

{¶43} Having found no error prejudicial to the Appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS, P.J. and PRESTON, J., concur.**

**/jlr**