OPINION
{¶ 1} Defendant-appellant, Jermal R. Towler, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of one count of aggravated murder in violation of R.C.2903.01, with a specification. Defendant assigns two errors:
First Assignment of Error
The trial court erred in entering judgment of conviction against defendant-appellant inasmuch as that judgment was rendered against the manifest weight of the evidence.
Second Assignment of Error
The trial court erred in entering judgment of conviction against defendant-appellant inasmuch as that judgment is not supported by legally sufficient evidence.
Because sufficient evidence and the manifest weight of the evidence support the trial court's judgment, we affirm.
 {¶ 2} By indictment filed April 11, 2003, defendant was charged with one count of aggravated murder in violation of R.C.2903.01, with a firearm specification under R.C. 2941.145, arising out of the August 10, 2002 death of Channing Allen. Pursuant to a trial held on January 9, 12 and 13, 2004, a jury found defendant guilty of aggravated murder, including the firearm specification. The trial court sentenced defendant to 20 years to life, with an additional three years for use of a firearm. Defendant's two assignments of error, which we consider jointly, assert the judgment of the trial court finding him guilty of aggravated murder with a specification is not supported by sufficient evidence or the manifest weight of the evidence.
 {¶ 3} To the extent defendant challenges his conviction as not supported by sufficient evidence, we construe the evidence in favor of the prosecution and determine whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, 260, paragraph two of the syllabus;State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387.
 {¶ 4} When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380,387 ("When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"); Conley, supra. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 5} According to the state's witness Lamont Crenshaw, he and his brother Henry stayed at 1307 E. 25th Avenue ("the residence") during the early part of 2002. When defendant started living with them, Henry moved out of the duplex. While Lamont continued to live there, he also stayed with his mother on the north end of Columbus and sometimes stayed with his girlfriend. According to Lamont, defendant had the back bedroom, sold drugs for a living, and carried a gun every day.
 {¶ 6} Between 11:30 p.m. and midnight on August 9, 2002, Lamont went to the residence, where he, Kwasi Rouse, Allen, also known as "Cuzzo," and defendant were to meet before going to the 504 Club. Rouse arrived with Lamont; defendant was already there. Rouse went to the back bedroom, and Lamont went to the front bedroom, both changing clothes in preparation for the evening. Downstairs, defendant and Cuzzo were arguing, as they had been when Lamont walked in, and they were becoming progressively louder. Although Lamont yelled for them to break it up, and went downstairs in an effort to accomplish that end, he was unsuccessful and returned upstairs. He heard defendant during the argument state, "[a]in't nobody about to leave this bitch. I'll kill everybody in this motherfucker." (Tr. Vol. II, 286.)
 {¶ 7} According to Lamont, he got tired of hearing them argue, so after a while he went back downstairs to tell them to stop. While he was on the stairs, he heard gunshots. When he returned upstairs, he scooped up miscellaneous items from a table, put them in his pocket and jumped out the front window. Among the items he took were Cuzzo's watch and chain, so Lamont could keep them from being stolen and return them to the victim's family. Lamont heard more shots as he jumped out the window and went to a neighbor's yard.
 {¶ 8} Lamont testified he knew who shot the victim because, at the time of the shooting, Lamont and Rouse were getting dressed, and the victim did not have a gun. He admitted he did not go back for Cuzzo or wait for the police, stating he was terrified. Instead, he went looking for comfort from friends at the 504 Club. He eventually spoke with the police on three separate occasions to tell them what happened. He also met with the victim's family and gave them the chain and watch.
 {¶ 9} Rouse's testimony was consistent with Lamont's in some aspects, but diverged in others. According to Rouse, when he arrived, only defendant was at the residence; Cuzzo came later. Rouse and Lamont arrived separately, but at exactly the same time. During Rouse's stay, defendant and Cuzzo began to argue. As the argument continued, Rouse was in the back bedroom changing clothes; Lamont was mostly in the bathroom, but occasionally attempted to break up the argument.
 {¶ 10} In getting ready for the evening, Rouse went downstairs to look for shoestrings and a belt. As he leaned over the couch looking in the corner for accessories, he heard a shot that came from inside the back door, and he ducked. He did not see who was shooting. He ran up the steps and into the back bedroom, when he heard Cuzzo scream. Rouse began to go out the window of the back bedroom, but he heard more shots fired. Because the shots sounded like they were coming from the back of the residence, he hesitated for a minute and saw defendant run down the alley from the back of the residence. As Rouse flipped from the window toward the roof over the back door, he saw someone, referred to as Art, standing there. Rouse asked for help in getting down, but because the person was too slow in responding, Rouse jumped and ran in the direction opposite that which defendant ran.
 {¶ 11} As Rouse was leaving, he threw on the shorts he had taken off in getting ready for the evening; in one of the pockets was a cell phone. He called Lamont to see if he was harmed and met Lamont on the street; they got into Rouse's vehicle and drove to Lamont's father's house.
 {¶ 12} While Lamont and Rouse testified to four occupants in the house, the state produced a fifth person, Norma Jean Whitson, a crack addict who cleaned the residence. She started cleaning for Lamont and Henry Crenshaw before defendant lived there and continued after defendant moved in. Her tasks included assisting in the care of two pit bull dogs and their puppies. She cleaned every day and took care of the dogs by feeding them once a day. According to Whitson, both Lamont and defendant sold marijuana at the address.
 {¶ 13} On August 9, 2002, she went to the residence at 11:30 p.m. or midnight to clean for that day; defendant and Cuzzo were there. Cuzzo asked her to get him something to drink at the store. When she returned from the store, both defendant and Cuzzo seemed fine, and she began to clean the kitchen. At some point, defendant and Cuzzo began arguing. Defendant went outside, leaving Cuzzo standing in the doorway.
 {¶ 14} According to Whitson, Cuzzo said, "[i]f we fight, let's fight head up, and we don't need no guns," and Cuzzo asked defendant to take the gun out of his pocket. (Tr. Vol. II, 428.) Whitson turned around to start washing dishes and heard a shot that sounded like it came from outside. As she turned to go downstairs to retrieve the puppies, she saw Cuzzo crawling toward her at the sink, crying for help. When she came back upstairs, she saw defendant standing over the body with a gun in his hand. Defendant ran up the stairs, and Whitson ran out with the puppies to the next door residence. When she made her way to the upstairs next door, she heard additional shots. She did not call the police or help the victim.
 {¶ 15} Kim Onyeneho lived in the other half of the duplex at 1309 E. 25th Avenue. In the late evening of August 9 or early morning hours of August 10, she was half asleep on a couch when she heard gunshots. She turned out the light because she was afraid and she peeked through the window to see two people dragging a body. Both African-Americans, the man wore a red shirt and blue jeans, and the woman was wearing all black. She later learned the man was Art and the woman was Peaches.
 {¶ 16} On August 10, 2002 at 12:30 a.m., the police were dispatched to the rear of the residence where they found someone lying face down. The victim was a partially unclothed African-American male, who appeared unconscious and bore gunshot wounds to the head. While the victim was found about 100 feet from the residence, the police saw a trail of blood that led from the victim to the back porch of the residence. The back porch was covered in blood that left a trail through the doorway, so the police believed the body came from the rear of the residence. On entering the residence to look for any other victims or a possible suspect, the police saw a large pool of blood in the kitchen area, but no one else was in the house. The cement steps to the residence were wet, and they appeared as if someone had tried to wash the blood off the steps. A search premised on the Kentucky license plates on the Dodge Intrepid found at the scene revealed the victim's picture.
 {¶ 17} In April 2003, John Davis, a patrol officer with the Columbus Division of Police who had been called to the residence on the night of August 10, 2002, observed a vehicle that failed to signal a change of direction. Davis turned in behind the vehicle, with beacons on, to make the traffic stop. The driver pulled over and put his vehicle in park. As Davis approached the vehicle, the driver put the vehicle in drive and sped off. Davis went back to his cruiser and asked for helicopter assistance in following the vehicle.
 {¶ 18} In his cruiser, Davis followed the driver. Going approximately 15 to 20 m.p.h., the driver opened his door and jumped from the vehicle, rolling three or four times in front of the cruiser. Davis had to stop his car and even then almost hit the driver, who jumped up and began running; the driver's car crashed into a parked vehicle. When Davis apprehended the driver, he asked his name, and the driver responded with false information. When Davis advised he was taking the driver to police headquarters for identification, the driver admitted he was Jermal Towler. Davis knew the name and that he was wanted pursuant to an active arrest warrant for murder.
 {¶ 19} According to Dr. Dorothy Dean, a deputy coroner for the Franklin County Coroner's office and a forensic pathologist, the victim was shot eight times; he exhibited eight entrance wounds and two exit wounds. She found bullets and fragments inside the body from six wounds, and a test of the victim's blood indicated marijuana and marijuana products. According to Dr. Dean, the victim died "from gunshot wounds to the head with perforation of his skull and brain." (Tr. Vol. III, 499.)
 {¶ 20} The state also presented the testimony of Mark Hardy, a criminalist with the Columbus Division of Police, who is an expert in firearm evaluation and identification. He testified that the bullets and fragments from the body that he examined had grooves consistent with a Taurus .44 weapon that defendant owned; police found the box for the gun at the residence. Hardy admitted, however, he could not say with certainty that the bullets came from that gun. Similarly, he testified that the bullets were not consistent with being fired from the gun that came out of the Desert Eagle box also found at the residence, but Hardy could not absolutely exclude that gun.
 {¶ 21} Defendant presented no evidence, relying instead on the cross-examination of the state's witnesses. At the conclusion of the state's case, defendant moved pursuant to Crim.R. 29 for acquittal, and the trial court overruled the motion.
 {¶ 22} As defendant accurately contends, the testimony of the state's witnesses, and in particular the testimony of Lamont Crenshaw, is not consistent. In determining the sufficiency of the evidence, however, we construe the evidence in favor of the state. Here, the testimony of Lamont Crenshaw, Kwasi Rouse, and Norma Whitson, if construed in the state's favor, establishes that the unarmed victim and defendant, armed with a gun, were engaged in a progressively escalating argument, leading to defendant's threatening to kill all the occupants of the house. While Crenshaw was on the stairs, Rouse was in the living room looking for accessories, and Whitson was in the kitchen washing dishes, they heard a gunshot. Whitson looked to find defendant standing over the victim holding a gun. The bullets and bullet fragments recovered from the scene and from the victim are consistent with being fired from the gun defendant was known to own. Defendant's contentions about the sufficiency of the evidence are unpersuasive.
 {¶ 23} In challenging the manifest weight of the evidence, defendant does not point to any particular element of the offense of aggravated murder, but challenges the underlying credibility of the state's witnesses as a group. While our review of the manifest weight of the evidence involves a limited weighing of the evidence, inconsistencies in the testimony generally do not render the verdict against the manifest weight of the evidence.State v. Thompson (1998), 127 Ohio App.3d 511, 529, discretionary appeal not allowed, 83 Ohio St.3d 1451 (stating that "[a] reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder");State v. Craig (Mar. 23, 2000), Franklin App. No. 99AP-739, citing State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236 (noting that "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence"). Rather, the jurors discount portions of a witness' testimony and accept only a part of it as true. State v. Burke, Franklin App. No. 02AP-1238, 2003-Ohio-2889, citing State v. Caldwell (1992),79 Ohio App.3d 667.
 {¶ 24} Defendant accurately points to matters in the testimony of the state's witnesses which could cause a reasonable juror to question the testimony presented. In particular, neither Lamont Crenshaw nor Rouse testified to Whitson's presence in the residence, yet she offered significant evidence in support of the state's case against defendant. Defendant also notes that Lamont Crenshaw testified he took the victim's jewelry and returned it to the victim's family, but nonetheless admitted he lied three times to the police when they questioned him about the jewelry. In addition, despite the friendship Rouse and Crenshaw enjoyed with the victim, after the shooting they did nothing to attend to the victim and failed to speak with the police until sometime later. Instead, they went to a club where they joined their friends. In a similar vein, although Whitson testified that she retrieved the puppies from the basement of the residence to remove them to the house next door, she did nothing to assist the victim, and she too failed to call the police.
 {¶ 25} In response, the state contends that the testimony of Lamont Crenshaw and Kwasi Rouse was believable when they stated they did not know Whitson was in the residence. According to the testimony, Whitson left the residence to retrieve a drink for the victim, and on her return she was in the kitchen, out of sight from much of the remainder of the downstairs. Moreover, the state submits that Lamont posited an explanation for his failure to tell the police about the victim's jewelry, citing his emotional state, which he also used to explain his conduct at the club subsequent to the shooting. Lastly, while the state acknowledges Lamont's failure to tell the truth to the police in some details, the state contrasts that with defendant who fled when he was apprehended in a traffic stop.
 {¶ 26} Although the inconsistencies in the testimony of the state's witnesses realistically could cause a juror to question the credibility of certain portions of that testimony, we cannot conclude the inconsistencies in the testimony render it so beyond belief that a reasonable juror could not accept it as true. Not only does the state posit explanations for the discrepancies defendant notes, but in addition the state's witnesses corroborated each other in significant aspects. As a result, even if the uncorroborated testimony be ignored, the remaining evidence supports defendant's conviction. State v. Harris
(1991), 73 Ohio App.3d 57, 67. Specifically, the state's witnesses generally agreed that the unarmed victim and defendant, armed with a gun, were arguing to the point of defendant's threatening to kill all the occupants of the house. While Crenshaw was on the stairs and Rouse was in the living room looking for accessories, they heard a gunshot; Rouse saw defendant run away in the alley behind the house. If the testimony of the fifth person be added to that of Lamont Crenshaw and Rouse, the jury also had Whitson's testimony that she heard the gunshot and eventually found defendant standing over the victim and holding a gun. Although the possibility exists that Rouse, Crenshaw and Whitson fabricated their testimony, the jury found it believable, and we cannot say the jury lost its way in so concluding.
 {¶ 27} Accordingly, defendant's two assignments of error are overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
Lazarus, P.J., and Bowman, J., concur.