OPINION
{¶ 1} Defendant-appellant, Cleveland R. Goodlow, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of aggravated murder in violation of R.C. 2903.01, and tampering with evidence in violation of R.C. 2921.12. Because the manifest weight of the evidence supports the trial court's judgment, and because any error in the trial court's evidentiary rulings was harmless, we affirm.
 {¶ 2} By indictment filed on April 23, 2004, defendant was charged with one count of aggravated murder and one count of tampering with evidence. Following several continuances, the charges were tried to a jury beginning on June 13, 2005. The jury found defendant guilty on both counts, and the trial court sentenced defendant accordingly. On appeal, defendant assigns two errors:
First Assignment of Error
THE OPINIONS OF THE STATE'S EXPERTS ON FINGERPRINT IDENTIFICATION AND DNA ANALYSIS SHOULD HAVE BEEN EXCLUDED AS NOT COMPLYING WITH EVID. R. 703.
Second Assignment of Error
THE VERDICTS OF GUILTY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 3} Defendant's second assignment of error asserts the inconsistencies and bias evident in the testimony of the state's primary witness render the jury's verdict against the manifest weight of the evidence. Because defendant's second assignment of error necessarily involves the facts underlying his conviction, we first address it.
 {¶ 4} When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387; State v. Thompkins (1997),78 Ohio St.3d 380, 387 (noting that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"). Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The jury thus may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." State v. Raver,
Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing Statev. Antill (1964), 176 Ohio St. 61, 67.
 {¶ 5} While our review of the manifest weight of the evidence involves a limited weighing of the evidence, inconsistencies in the testimony generally do not render the verdict against the manifest weight of the evidence. Raver, at ¶ 21; State v.Thompson (1998), 127 Ohio App.3d 511, discretionary appeal not allowed, 83 Ohio St.3d 1451 (stating that "[a] review in court must, therefore, accord due deference to the credibility determinations made by the fact-finder"); State v. Craig (Mar. 23, 2000), Franklin App. No. 99AP-739, citing State v. Nivens
(May 28, 1996), Franklin App. No. 95APA09-1236 (noting that "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence").
 {¶ 6} The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and to determine whether the witnesses' testimony is credible. State v. Williams, Franklin App. No. 02AP-35, 2002-Ohio-4503, at ¶ 58; State v. Clarke (Sept. 25, 2001), Franklin App. No. 01AP-194. Thus, jurors need not believe all of a witness' testimony, but may accept only portions of it as true.Raver, at ¶ 21; State v. Burke, Franklin App. No. 02AP-1238, 2003-Ohio-2889, citing State v. Caldwell (1992),79 Ohio App.3d 667. Although an appellate court acts as a "thirteenth juror" when considering the manifest weight of the evidence, it also must give due deference to the fact finder's determination of the witnesses' credibility. State v. Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037, at ¶ 28; State v. Hairston, Franklin App. No. 01AP-1393, 2002-Ohio-4491, at ¶ 74.
 {¶ 7} Within those parameters, we examine the state's evidence. According to that evidence, Pamela Carter, sister of Jeneice Smith, stated that Smith, the mother of eight children, was staying at an apartment on Oakland Park on December 22, 2003. Although the witness was uncertain, she understood Smith was staying with defendant. Carter met defendant a couple of years earlier when she went to visit her sister; defendant was visiting with what she assumed was defendant's wife.
 {¶ 8} About eight days before Christmas, Smith asked Carter for an outfit to wear for her grandfather's funeral. Smith, however, did not attend the funeral, and Carter found Smith's absence quite unusual. When Carter did not hear from Smith on Christmas day, the day of Smith's oldest daughter's birthday, Carter became concerned. She went by the apartment at 1946 Oakland Park on December 26, knocked, and received no answer. When a next-door neighbor would not assist, she went across the street to her mother's friend, Dee, who had called a week earlier because she was concerned about Smith. Dee helped Carter locate defendant at his girlfriend's house.
 {¶ 9} When Carter arrived, defendant's girlfriend got defendant out of bed. Carter asked defendant when he last saw Smith, but he could not give Carter a straight answer. According to Carter, defendant could not look her in the face, stated he had no key to the apartment and, in response to Carter's inquiry about when defendant last saw Smith, defendant said he did not know or did not remember.
 {¶ 10} Carter again called her mother, who directed her to the rental office. The representative from the rental office unlocked the door and stood back. Carter opened the door just a little to peek inside the apartment; she saw a chair tipped over and splattered with blood. When Carter went to open the door further, she hit something. She looked, saw it was Smith's foot, closed the door and began screaming.
 {¶ 11} On December 26, 2003, Michael Van Cleef, a firefighter and paramedic with the Clinton Township Fire Department, received a call to go to 1946 Oakland Park. On arriving, he attempted to open the unlocked door, but discovered Smith's body was pushing up against it. He found the victim's body partly uncovered; due to its condition, he could not say what part of the body was revealed. He found two detached fingers in the middle of the room and blood splattered throughout the apartment.
 {¶ 12} Gary Wilgus, a Special Agent with the Bureau of Criminal Identification and Investigation ("BCI"), also was called to the scene. He discussed the case with the lead detective, Dave Conley of the Franklin County Sheriff's Office, and checked for physical evidence outside the building that might be useful in a DNA analysis. He found no recent signs of forced entry. He then went inside and documented the scene, collecting cups, ashtrays, and miscellaneous items for testing, including cigarette butts from an ashtray in the living room area. He also took latent fingerprints from the back of the door, the ashtray, telephones, mirrors, toilet lids, and a black plate. According to Wilgus, he packed the items and submitted them.
 {¶ 13} Robin Roggenbeck, a forensic scientist with BCI working as a latent print examiner, testified she found defendant's left thumbprint on the black plate that was located on the carpet in front of the sofa. She further found defendant's middle fingerprint on a white ashtray found in the same area. Defendant's right index finger matched the print from the toilet lid, and his right thumb matched the print from the battery cover of the telephone.
 {¶ 14} Sarah Custis, a forensic scientist with BCI assigned to the Serology and DNA section, found that defendant's DNA could not be excluded as a contributor on the cigarette butts; she reached the same conclusion regarding the pen taken from the apartment. She admitted, however, that she obtained an incomplete profile for the pen and therefore concluded that one in five people could not be excluded as a contributor to the DNA found on the pen. By contrast, the frequency of occurrence of defendant's DNA found on the cigarette butts is 1 in 2,040,000,000,000,000, strongly suggesting defendant's DNA on the cigarette butts. According to Custis, she could not determine when the substance containing the DNA was put on the objects.
 {¶ 15} Dr. Patrick Fardal, former Chief Forensic Pathologist and Deputy Coroner in the Franklin County Coroner's office, testified the victim suffered multiple sharp wounds to various body parts, a fractured skull, and some severed fingers. Her 53 wounds were distributed with eight to the head, three to the left leg and thigh, four to the right leg and thigh, 15 to the back and side, two to the anterior trunk, seven to the right arm and hand, including an upper arm laceration to the bone, and 14 to the left arm and hand. Internally, her rib cage separated, causing her ribs to break. As a result, the left-side wounds entered the left chest cavity and caused injury to the vessels leading to the left lung and bronchus. According to Fardal, Smith died as a result of multiple sharp instrument wounds to her body, including one or more that entered into her left chest cavity and caused the noted injury. He testified, however, that her head wound also could have accounted for her death.
 {¶ 16} The state's most significant witness was Antonio Hill, also known as Tatoo or Tone. According to Hill, he had known defendant a couple of years; they were "tight," and in the past he stayed with defendant and the victim. (Tr. 202.) He took defendant to the victim's apartment for dinner before Christmas 2003, spoke to everyone, dropped defendant off, and then left. Hill went home where he played video games with his three-year-old daughter. Defendant later called him and said he was frustrated and about to kill Smith; he wanted Hill to give him a ride. Defendant again called Hill and said he did it. Hill did not believe defendant, so he met defendant at a gas station; from there, they went back to Smith's apartment. Hill opened the back door and found Smith's dead body. Hill and defendant got in the car and left.
 {¶ 17} After returning to Hill's house, defendant and Hill talked. When the prosecution at trial asked what defendant said about the events between him and the victim, Hill replied, "he really didn't say too much, you know what I'm saying. They were sitting there talking and talking, and he cut her up. * * * He said that he was sitting in the chair from the door. She was sitting on the couch, you know what I'm saying. He grabbed the sword, I mean, you know what I'm saying, swung — she went to put her hand up you know what I'm saying, hit her in the hand — went to speak — he hit in the mouth — went to run for the door, he hit her in the back. And he was, like, he just cut her down, last one across her throat." (Tr. 207-208.)
 {¶ 18} Hill testified that after defendant killed Smith, defendant went back every day to check the mail; he wanted to be sure neighbors saw him so that nothing would appear out of character. Hill subsequently was arrested, and during the time he was in custody, "started knowing whole bunch of stuff that only me and Cleve knew." (Tr. 211.) Hill knew he was the only one with a key to Smith's apartment and thought defendant was using that fact to blame Hill for the murder. Given those circumstances, Hill decided to testify against defendant, despite being close friends with him.
 {¶ 19} By contrast, defendant testified he had a romantic relationship with the victim for a few years, but it ended sometime after Thanksgiving 2003 due to many personal problems between them. After the breakup, he lived across the hall from her until Smith moved across the street. Although defendant had a key to her apartment, he gave it to some people who moved in with the victim. After installing a lock to the back door, he "ended up with the key." (Tr. 306.) He tried to return the back door key to Smith; she did not want it, so he gave it to Hill.
 {¶ 20} According to defendant, he was at the victim's apartment two times in December. The first time was shortly after he broke up with her, when they got into an altercation. He slapped her, rupturing her ear drum. He testified he felt so bad about the incident, he told his mother. Defendant stated that he apologized to the victim, as nothing like that had happened before the December incident.
 {¶ 21} The second visit was close to Christmas, toward the evening of the day. According to defendant, the victim called because she wanted to talk to him, and he wanted to talk to her to once again to apologize. When defendant arrived, Smith had a plate with a substance on it that defendant believed to be cocaine. According to defendant, "we just sat there and talked for a minute. She had just told me a few things. And, you know, we talked about why it wouldn't work. That was pretty much it." (Tr. 311.) Defendant testified he probably smoked a cigarette while he was there, as they always shared cigarettes. He further stated that he touched the plate she showed him, though he is not sure if he touched any glasses. He estimated he was at the apartment less than ten minutes. Defendant testified the presence of his fingerprints in the apartment would not be unusual.
 {¶ 22} When asked about the sword found in the victim's apartment, defendant testified the sword was his, but he gave it to Smith when she asked for it for protection after he moved out of the apartment. According to defendant, Hill asked for the sword several weeks after defendant gave it to Smith. Hill told defendant "something happened, and he needed to use it for something." (Tr. 315.) Although defendant testified that he told Hill to get the sword from Smith, defendant also testified he met with Smith to retrieve the sword.
 {¶ 23} When defendant met with Smith, defendant found the rope around the handle of the sword was unraveled. As defendant prepared to wrap the unraveled rope, Smith told him to put on some gloves: "So she said, do you know what he might be doing with that sword?" (Tr. 316.) After completing the task, defendant apparently gave the sword to Hill; defendant testified he next saw it when Hill brought it to him. Although defendant thought Hill was returning it, Hill instead asked defendant to dispose of it. Defendant threw it into the dumpster with the rest of the trash.
 {¶ 24} Hill and defendant were the only witnesses to testify to the events of the evening of Smith's death. Virtually all of the remaining evidence dealt with the scene of the crime and events following the victim's death. The jury thus was required to weigh the credibility of the testimony Hill and defendant rendered, determine which was more credible, and return a verdict accordingly. The jury apparently found Hill more persuasive, and so it rendered a verdict against defendant. Despite the jury's prerogative in assessing credibility of witnesses, defendant contends the judgment is against the manifest weight of the evidence because of serious discrepancies in Hill's impeached testimony.
 {¶ 25} Defendant's cross-examination of Hill presented an opportunity for the jury to discredit Hill's testimony. Specifically, defendant's questions elicited the nature of Hill's livelihood, and Hill was forced to admit that in December 2003 his only source of income was selling crack cocaine, from which he made approximately $500 per week. Hill also admitted that he, with Smith's knowledge, was selling drugs out of the victim's apartment and had sexual relations with Smith. When Hill testified, "I don't do drugs," defendant's cross-examination caused Hill to qualify his testimony by admitting that he snorted cocaine in December 2003 but does not presently. (Tr. 230.)
 {¶ 26} To discredit Hill's testimony about the night of the murder and defendant's involvement in the killing, defendant's questions caused Hill to acknowledge that defendant had no blood on his clothes or shoes when Hill picked him up at Smith's apartment. In the course of inquiry suggesting Hill's presence at the scene, defendant questioned Hill about his palm print found on the back door of Smith's apartment. Hill testified he never went in the back door, but pushed it open with his hand, and thus his palm print was on the door; other evidence, however, revealed that the print was on the inside of the door.
 {¶ 27} Perhaps most damaging to Hill's credibility were defendant's questions to Hill about a proffer letter the prosecution signed indicating that as long as Hill did not confess to the killing, Hill would be "in the clear." (Tr. 236.) Hill further admitted that before his custodial interrogation on January 31, 2004, when he first learned defendant was attempting to blame Hill for Smith's death, he did not mention Smith's death to law enforcement.
 {¶ 28} While defendant potentially discredited Hill's testimony through his cross-examination of Hill, the state produced evidence that discredited defendant's testimony: a conversation between defendant and Hill that occurred while Hill was wearing a wire. The tapes of that conversation, along with a transcript of the conversation, were presented during the trial. In the course of the conversation, defendant made a number of statements the jurors could construe as incriminating. For example, on the tape defendant stated:
Goodlow: Because the way shit was it was suppose to be a crime of passion. Because of how she was dressed and they said she was relaxed and comfortable and she died you understand what I'm saying[.]
(State's Exhibit K1, 3.)
Discussing the murder weapon, defendant stated:
Goodlow: You know why I ain't worried about it, cause even if they was to find that blade, you know why, what that rope is for?
Hill: Uh uh
Goodlow: At the end of that blade?
Hill: Naw, what's it for?
Goodlow: You can't pull a print off of that shit. Rope, for whatever reason, you cannot pull a fingerprint off of that shit, that's why they fingerprinted me[.]
(State's Exhibit K2, 3.)
 {¶ 29} Still discussing the sword, defendant stated:
Goodlow: That's what, let me tell you, the night that shit happened, it was trash, it was trash day that day, with that sword, I had the gloves on anyways and with that shit, that shit is oiled down, you cannot pull a print off of those ropes. Why you can't pull a print off of those ropes, those ropes, those swords is pretty much made for, was made for killing, why I use the rope is because you cannot pull a print off of it because of all the little lines in the shit[.]
(State's Exhibit K2, 5.)
 {¶ 30} Later still, defendant stated:
Goodlow: Every fucking night when I go to sleep, that whole night flashes through my head
Hill: Uh huh
Goodlow: Not crazy like, but the way it flashes through my head
Hill: Is the way the shit went down?
Goodlow: ____ I can literally picture, step by step and I just been making sure I didn't leave anything behind
Hill: fucked up behind
Goodlow: Cause I remember the one thing I didn't do, she offered me some shit off that plate, but I mean I was like, naw, I'm straight, I never touched it, she offered me a drink, ____ 40, naw I'm straight, so I know my hand, fingerprints
Hill: _______ on the plates
Goodlow: Mother fucking fingerprints weren't on no glasses, no nothing, never touched anything else ____ I know I didn't leave shit behind
Hill: Yeah
Goodlow: Just as fast as I was leaving, just as fast as I was out.
(State's Exhibit K3, 2-3.)
 {¶ 31} Without question, defendant attempted to explain away the various statements. Although defendant acknowledged he said the night kept going through his mind, defendant indicated he meant that he kept thinking whether he touched anything that would wrongly incriminate him. Likewise, although his explanation of the rope on the handle to Hill implied that he wanted no one to trace his fingerprints to the murder weapon, defendant's testimony suggested that he was careful so as to not implicate himself in whatever nefarious conduct Hill intended to pursue with the sword.
 {¶ 32} Defendant correctly argues that various aspects of Hill's testimony left the jury with the task of determining the more credible witness. None of the factors defendant cites, however, requires that the jury believe defendant and disbelieve Hill. Confronted with evidence suggesting a reason for Hill to fabricate the story, as well as a tape-recorded conversation incriminating defendant, the jury was left to choose the evidence it believed. We cannot say it lost its way in finding defendant's explanations for his tape-recorded conversation with Hill to be less than credible. Given the evidence the jury was presented, the jury's verdict is not against the manifest weight of the evidence. Defendant's second assignment of error is overruled.
 {¶ 33} Defendant's first assignment of error asserts the trial court improperly allowed testimony regarding the results of tests conducted for fingerprints and DNA analysis, as the state failed to lay a proper foundation for the testimony. The state presented evidence that Wilgus gathered evidence from the scene and presented it to BCI. The state further presented evidence of the tests BCI ran on the evidence Wilgus presented. Defendant, however, contends that evidence falls short of establishing the necessary chain of custody.
 {¶ 34} Even if the state's evidence falls short of establishing the chain of custody, the record presents no prejudice to defendant. The testimony from the BCI forensic scientists established only that defendant was in the victim's apartment at some time. Defendant himself admitted that he was in the apartment and that finding his fingerprints or DNA evidence in the apartment would not be unusual. Because the BCI witnesses were unable to ascertain when defendant's DNA or fingerprints were placed in the apartment, defendant's admission that he was there renders nonprejudicial any error in the trial court's admitting the testimony of the BCI forensic scientists. Defendant's second assignment of error is overruled.
 {¶ 35} Having overruled both of defendant's assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
Klatt, P.J., and Sadler, J., concur.