[Cite as *Jalm Marion, L.L.C. v. Fair Park Ents., Inc.*, 2017-Ohio-4350.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

JALM MARION, LLC.,

    PLAINTIFF-APPELLEE,           CASE NO. 9-16-42

    v.

FAIR PARK ENTERPRISES, INC.,

                                 **O P I N I O N**

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 15-CV-0115

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision:  June 19, 2017**

APPEARANCES:

    *Brent M. Harraman* for Appellant

    *William V. Beach* for Appellee

**WILLAMOWKSI, J.**

{¶1} Defendant-appellant Fair Park Enterprises, Inc. ("FPE") brings this appeal from the judgment of the Court of Common Pleas of Marion County finding in favor of plaintiff-appellee Jalm Marion, LLC ("JM"). FPE claims that the trial court's judgment is against the manifest weight of the evidence, the trial court did not interrogate witnesses in an impartial manner, and the trial court erred in its computation of damages. For the reasons set forth below, the judgment is affirmed in part and reversed in part.

{¶2} In June of 2011, FPE and JM entered into an agreement for FPE to sell real estate in Marion County to JM. As part of the agreement, it was agreed that FPE would repair sections of the concrete parking lot. The amount of $25,000 of the purchase price was placed into escrow until the repairs were completed. The repairs occurred in June and July of 2011. The repairs consisted of putting down a new four-inch stone foundation and then pouring four inches of concrete containing fiber mesh. This matched the consistency of the existing parking lot. Afterwards, the CEO of JM, Mike Needler ("Needler") inspected the repairs, was satisfied with the work, and released the escrowed funds to FPE on July 26, 2011. Ex. 10. A few months later, portions of the repaired surfaces began to deteriorate. In November 2011, Needler contacted the owner of FPE at that time, George Scantland III ("Scantland"). Needler sent Scantland images of the failing sections. Scantland and

Needler agreed at that time that if Needler paid for the materials to repair the issues, Scantland would provide the equipment and labor. However, no repairs were made at that time. In late 2012, Needler again contacted Scantland about the repairs. Scantland informed him that he was no longer an owner of FPE and told Needler to contact the current owners. The current owners of FPE indicated that they felt they had no responsibility to make further repairs.

{¶3} In the summer of 2014, JM hired Carlos Rhodes ("Rhodes") to make repairs to the parking lot. Some of the areas repaired by Rhodes were not part of the original repairs. Additionally, some of the original repairs did not need further repairs. Rhodes repaired the sections by laying a new four-inch stone foundation and adding six inches of concrete with rebar. On March 16, 2015, JM filed a complaint alleging that FPE did not complete the repairs in a workmanlike manner and sought damages in the amount of $18,600, the amount that Rhodes charged for all the repairs. Doc. 1. An amended complaint alleging the same thing was filed on April 6, 2015. Doc. 4. FPE filed its amended answer on May 21, 2015 with additional amended answers being filed on March 2, 2016, and on June 21, 2016. Doc. 8, 16, 39

{¶4} A bench trial was held on June 30, 2016. Doc. 42. At the trial, the parties made the following stipulations. First, photos need not be authenticated, but the dates must be established and all enhancements must be disclosed. Tr. 9-10.

Second, Scantland's ownership interest in FPE ended on October 17, 2012. Tr. 10. Carol Farverick was the sole owner of FPE since that time. Tr. 10. Third, consideration for the original sale of the real estate was a mortgage and note from JM to FPE. Tr. 10. JM made regular monthly payments of $3,324.05 from July 1, 2011 until July 1, 2013. Tr. 10. Fourth, the aerial photos of the property by the county auditor do not need to be authenticated and FPE's aerial photos of the property were taken in Spring 2013. Tr. 11. Fifth, JM determined what repairs had to be made originally. Tr. 11. JM also had the opportunity to observe the repairs being made and the materials being used. Tr. 11. Sixth, Scantland was not in Ohio at the time the repairs were made. Tr. 11. Seventh, the escrow agreement was drafted by JM. Tr. 11. Eighth, JM's grocery store was open during all times repairs were made. Tr. 11. Ninth, not all areas repaired by FPE in 2011 required repair by Rhodes in 2014. Tr. 11-12. Tenth, Rhodes was not present when the original repairs were made. Tr. 12. Rhodes also repaired areas of the parking lot that did not require repair in 2011. Tr. 12.

{¶5} JM presented the testimony of two witnesses. The first witness was Needler. Needler testified that he bought the store in 2011 and required repairs to the parking lot as part of the agreement due to the lot being in "terrible shape" before the purchase. Tr. 20-24. Before closing, Needler and Scantland agreed to what repairs would be done. Tr. 25. Needler testified that he expected the repairs

required by the escrow agreement to last longer than the unrepaired areas. Tr. 28. Once the repairs were done, Needler went to the store and inspected the repairs. Tr. 30. After agreeing that all required repairs were done, he released the money held in escrow. Tr. 29-30.

{¶6} Two months after the initial repairs, some of the repaired areas started deteriorating. Tr. 30. Needler testified that it appeared that most of the repairs were cracking and sinking. Tr. 37. At that time, Needler called Scantland and complained that the repairs were "gone". Tr. 26. Scantland claimed that the repairs had deteriorated because JM had allowed people to drive over the concrete before it had properly cured. Tr. 31. Pictures of the damage were sent to Scantland on November 15, 2011. Tr. 33. The parties eventually reached an agreement where JM would pay for the materials and FPE would pay for the equipment and labor to repair the damages. Tr. 31, 37. Needler identified Ex. 54 as an email showing the agreement. Tr. 40. Since it was November, no repairs were done at that time. Tr. 41. No repairs were made in the Spring or Summer either.

{¶7} In late 2012, Needler again contacted Scantland about the failed repairs. Tr. 44. At that time, Scantland informed him that he had sold his interest in the business to his sister, so Needler would need to "take it up with her." Tr. 44. Needler then contacted her, but she refused to make further repairs. Tr. 45. In Summer 2014, Needler tried one last time to get FPE to make the repairs, but they

refused. Tr. 56. Needler then hired Rhodes to make the repairs and sued for damages. Tr. 45, 56. Rhodes charged JM $18,600 for all of the repairs. Tr. 56. Rhodes added stone, rebar, and cement with fiber at a six-inch depth. Tr. 57. Needler admitted that some of the pictures showing the deterioration in the parking lot were not part of the original repairs, but were instead just additional normal wear and tear that had occurred over the years. Tr. 48-51. According to Needler only 5% of the repairs were areas not originally repaired. Tr. 59.

{¶8} On cross-examination, Needler admitted that there was possibly "cut through" traffic in the parking lot. Tr. 66. Needler also admitted that the original parking lot did not contain rebar and that Rhodes had installed more concrete than was in the original, unrepaired lot. Tr. 67. Needler did not deny that any barricades erected by FPE at the time of the original repairs may have been moved by third parties. Tr. 75.

{¶9} David Sass ("Sass") testified that he was the manager of the store during 2011-12. Tr. 95. Sass testified that Jason Gier ("Gier") was the maintenance person for FPE who cared for the property when they were renting it. Tr. 97. At that time, Gier had repaired sections of the parking lot. Tr. 96. When the original repairs were poured, Sass was instructed to let the concrete cure and to keep cars and people off of it. Tr. 98. A couple of times when he came to the store, he saw the caution tape broken and had to refasten it. Tr. 100. He also was told a couple of times that a car

had gone through the tape and he saw evidence of it in a couple of spots. Tr. 100. Within a month or two of the repairs, there was crumbling in a few spots. Tr. 109. In spots, the concrete sank two to three inches. Tr. 111. Sass sent pictures of the failing repairs to Needler. Tr. 106. Sass testified that he was responsible for the store, but left the parking lot to the people doing the repairs. Tr. 98.

{¶10} On cross-examination Sass admitted that when the old concrete was cut out, he did not recall seeing any rebar. Tr. 114. Sass also admitted that he did not tell Needler about the barriers being taken down and does not know if he said anything to Gier. Tr. 115-17. According to Sass, the barriers could have been intentionally moved by people and he did see tire impressions in the concrete in places. Tr. 121-22. The repairs were made in three different sections of the parking lot and looked good when completed. Tr. 123-26.

{¶11} Following Sass' testimony, JM rested and FPE presented its case-in-chief. Gary Knapp ("Knapp") testified that he had been working with concrete for 34 years and that he had installed two sections of the concrete at the store. Tr. 135. Knapp indicated that he used a concrete mix rated at 4,500 PSI, even though only 4,000 PSI was required. Tr. 136. Knapp testified that what he ordered was standard quality for parking lot applications and that he had installed it with fiber mesh rather than rebar for reinforcement. Tr. 137-38. According to Knapp, the areas that had been repaired and were damaged were areas where vehicles were driving across it.

Tr. 141. Knapp testified that people were actually driving through the concrete as it was being poured. Tr. 143. Knapp would put up barriers, but they would be missing when he would drive by later that night. Tr. 143. The barriers used included a dump truck, five gallon buckets with concrete and poles in them, orange traffic cones, and caution tape. Tr. 144. The barriers had not blown down, but appeared to be deliberately moved. Tr. 145. Knapp testified that when he arrived on the job site in the morning, he would find the barriers piled inside shopping carts. Tr. 145. Although Knapp did not see cars driving over the fresh concrete, other than the one instance, he knew they had done so based upon where they were parked. Tr. 159. He also testified that the gravel base beneath the concrete had been compacted because he observed Gier doing the work. Tr. 162. When he installed the new concrete, he saw that there was no rebar in the old concrete and he did not put rebar in the new concrete. Tr. 166. What was installed was the standard four-inch gravel foundation and four-inch concrete for a parking lot. Tr. 167. Knapp testified that the areas where the cars had not been allowed to drive were still intact. Tr. 160.

{¶12} On cross-examination, Knapp admitted that he had personally not seen anyone remove the barriers or drive on the fresh concrete. Tr. 148-49. Knapp also admitted that concrete done correctly should last up to ten years. Tr. 150. Based upon his experience the problems with this concrete was that people had been

allowed to drive on it prior to it fully curing. Tr. 150. Knapp indicated that seven eighths of the areas repaired were no longer intact. Tr. 156.

{¶13} Shawn Barr ("Barr") testified on behalf of FPE that he had been a sub-contractor working on the original repairs. Tr. 170. His job was to cut out the old, damaged sections and help level the foundation. Tr. 170. Barr testified that people frequently moved the barriers that were erected, even before the new concrete was poured. Tr. 172. Barr testified that people just drove through the holes and would drive over the wet concrete within an hour of the pouring. Tr. 172. After the first day, he returned to the site to find the barriers inside shopping carts and pushed off to the side. Tr. 174. Throughout the job, the barriers would be removed multiple times, even in the same day. Tr. 175. The barriers used were the same type as would be used on any job. Tr. 176. The day after the concrete was poured, there were cars parked in the vicinity of the repairs, and even parked on top of the new concrete. Tr. 177-78. Barr also testified that the original concrete which he removed did not contain rebar. Tr. 179. Prior to Rhodes repairing the concrete, he had observed that some of the repaired areas were cracked, but that the west side was in good shape. Tr. 180.

{¶14} On cross-examination, Barr testified that he had added stone to the foundation and compacted it. Tr. 182. The goal was to smooth it out and make it consistent. Tr. 182. Gier was in charge of the project. Tr. 183. According to Barr,

he believed that the current commercial grade depth for concrete is six inches, more if there are heavy trucks. Tr. 185.

{¶15} Thomas Troiana ("Troiana") testified that he assisted Knapp in pouring the concrete for the original repairs. Tr. 188. Troiana indicated that before the concrete was poured, he observed that Number 57 stone was put in for the base and compacted. Tr. 189. The stone was approximately four to four and a half inches thick and looked correct. Tr. 189. The concrete mix used was a "basic six and a half bag, 4500 PSI mix." Tr. 191. During the project, the barriers were constantly being removed by unknown parties and had to be repeatedly replaced. Tr. 192-93. The barriers used in this job were "a little bit better" than just using orange traffic cones. Tr. 193. Troiana also testified that there was no rebar in the original concrete lot. Tr. 195. When questioned about common causes of cracking in concrete, Troiana admitted that cracks can be an indicator that something was wrong with the foundation. Troiana indicated that a concrete installer is only liable for failure if the concrete were to crack within thirty days and the crack was larger than ¼ inch wide. Tr. 197. According to Troiana, JM should have contacted them immediately when the first problems occurred. Tr. 197.

{¶16} Gier testified that he worked for FPE and assisted in the original concrete repairs. Tr. 219. He was responsible for cutting out the sections of concrete removed for removal. Tr. 221. He would make the cuts, then use the

jackhammer to break up the pieces. Tr. 222. The next step was to dig out the old gravel, put in new gravel, compact it, and keep adding until he had a four-inch foundation of stone. Tr. 222-23. Gier testified that he used Number 57 stone for the base. Tr. 222. The concrete people then added four inches of concrete. Tr. 223. When Gier removed the old concrete, there was no rebar in the original pad. Tr. 224. Once the concrete was poured, they put up barriers to keep people away from the fresh concrete so that it could cure. Tr. 225. People would move the barriers out of their way two to three times a day. Tr. 226-27. There was evidence that cars had driven over the fresh concrete in that they were parked in locations where it would have required driving over the fresh concrete to get to that spot. Tr. 229-30. According to Gier, some of the repaired concrete was still in good shape. Tr. 232. However, those locations were where the vehicles could not have driven on them. By 2014, many sections of the old concrete had failed as well and were also repaired. Tr. 236. Gier testified that the problems with the repairs were caused by people driving on the concrete before it had fully cured. Tr. 240.

{¶17} On cross-examination, Gier admitted that he was not an expert on concrete and had not researched any code requirements. Tr. 245. He also admitted that he had used stones larger than Number 57 stone to fill in holes beneath the four-inch base. Tr. 248-50. Gier indicated that he had only seen one person actually driving on the fresh concrete and that location was repaired. Tr. 256. He was merely

-11-

concluding that they had driven on the fresh concrete based upon where they were parked. Tr. 256. Gier also admitted that he knew from the first day that people were moving the barriers, but just kept replacing the barriers. Tr. 264-69. According to Gier, over half of the original repairs were still okay in 2014. Tr. 271.

{¶18} On July 11, 2016, the trial court entered its judgment entry including its findings of fact and conclusions of law. Doc. 42. The trial court concluded that the repairs "were not made in a workmanlike manner which resulted in the repairs needing to be redone." *Id*. at 7. The trial court then ordered that FPE pay damages in the amount of $15,810 to JM. *Id*. at 9. FPE filed a timely notice of appeal. Doc. 50. On appeal, FPE raises the following assignments of error.

### First Assignment of Error

**The trial court erred in finding that the failure of concrete repairs made by [FPE] was the result of [FPE's] negligence or failure to perform in a workmanlike manner in breach of the parties' contract, [was] against the manifest weight of the evidence.**

### Second Assignment of Error

**The trial court erred by failing to interrogate witnesses in an impartial manner as required by Rule 614(B) of the Ohio Rules of Evidence.**

### Third Assignment of Error

**The trial court erred in its computation of damages.**

*Manifest Weight of the Evidence*

{¶19} In the first assignment of error, FPE claims that the judgment of the trial court finding the repairs to the work to be not performed in a workmanlike manner is against the manifest weight of the evidence. When reviewing a judgment to determine if it is against the manifest weight of the evidence, an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Mendoza*, 137 Ohio App.3d 336, 2000-Ohio-1689, 738 N.E.2d 822, (3d Dist.). *See, also, State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

> **Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."**

*Thompkins*, *supra*, (citing Black's Law Dictionary (6 Ed.1990) 1594). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against the verdict. *Id*.

{¶20} Although the appellate court acts as a thirteenth juror, it still must give due deference to the findings made by the trier of fact.

**The fact-finder * * * occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness' reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.**

*State v. Thompson*, 127 Ohio App.3d 511, 529, 713 N.E.2d 456 (8th Dist. 1998). "To that end, the fact-finder is free to believe all, part or none of the testimony of each witness appearing before it." *State v. Redman*, 3d Dist. Allen No. 1-15-54, 2016-Ohio-860, ¶ 31 quoting *State v. Petty*, 10th Dist. Franklin Nos. 11AP-716, 11AP-766, 2012-Ohio-2989, ¶ 38.

{¶21} In this case, JM claimed that the original repairs to the parking lot were not performed in a workmanlike manner. The undisputed testimony was that the repairs were completed in June and July of 2011. Within two months of the completion, sections of the repaired concrete were already beginning to disintegrate. No one argues that the repaired concrete should not have lasted longer than a couple of months. The sole issue before the trial court was why the concrete was failing. JM claimed that the issues with the lot were caused by the failure of FPE to properly make the repairs. FPE claimed that the concrete was failing due to the actions of third parties, i.e. people moving the barriers and driving on the fresh concrete before it had properly cured. The trial court made a specific finding of fact that it was "likely that some cars did drive over at least some portions of the concrete before it

was fully cured". Doc. 42 at 6. However, the trial court found that this was not the cause of the failure of the concrete. *Id.* Instead, the trial court determined that the failure was the result of the foundation not being properly prepared. *Id.* at 7. There was testimony presented that an improper foundation could lead to the sinking that was observed in the areas repaired. As there was some competent, credible evidence to support the findings of the trial court, this court cannot determine that the judgment of the trial court was against the manifest weight of the evidence. Thus, the first assignment of error is overruled.

*Questioning of Witnesses by the Trial Court*

{¶22} In its second assignment of error, FPE claims that the trial court failed to interrogate witnesses in an impartial manner. A trial court may interrogate witnesses as long as it does so in an impartial manner. Evid.R. 614(B). This court has previously addressed the questioning of a witness by the trial court and whether it was done in an impartial manner in the case of *State v. Wendel*, 3d Dist. Union No. 14-16-08, 2016-Ohio-7915, 74 N.E.3d 806. In *Wendel*, appellant argued that the trial court had failed to question a witness in an impartial manner, instead showing bias. This court determined that

> **" '[a]bsent a showing of bias, prejudice, or prodding of the witness to elicit partisan testimony, it is presumed that the trial court interrogated the witness in an impartial manner in an attempt to ascertain a material fact or develop the truth.' " *State v. Inskeep*, 3d Dist. Union No. 14–2000–13, 2000 WL 1151065, \*2 (Aug. 15, 2000), quoting *State v. Blankenship*, 102 Ohio App.3d 534, 548,**

> **657 N.E.2d 559 (12th Dist.1995). " 'A trial court's interrogation of a witness is not deemed partial for purposes of Evid. R. 614(B) merely because the evidence elicited during the questioning is potentially damaging to the defendant.' "** *Id.*, quoting *Blankenship* **at 548, 657 N.E.2d 559.**

*Wendel* at ¶ 31.

{¶23} Here, FPE argues that the trial court was not impartial in questioning Knapp. FPE points to pages in the transcript where the trial court was questioning Knapp about concrete cracking if people drive on it prior to it being fully cured. Tr. 157-58. The trial court discussed signs of cracking immediately after the concrete was disturbed by vehicular traffic, and obtained testimony from Knapp that there was no immediate sign of cracking. FPE argues that the trial court then failed to address whether there would be long term damage as a result of vehicular traffic on the uncured concrete. FPE claims that the trial court treated Knapp as a hostile witness on cross-exam, trying the case on behalf of JM. This court notes that a review of the record does indicate that the trial court did not ask about the long term consequences. However, it also shows that FPE could have asked those questions in response to the trial court's questioning, but did not do so. The record also contains no showing of bias by the trial court. While there might be cause for concern if this case had been tried to a jury with the alleged tone of the trial court's questions, that was not the case here. This was a bench trial. In a jury trial, there is concern that a trial judge could influence the opinions of the jury about the

credibility of a witness if the judge were to cross-examine the witness. However, in a bench trial, the trial court is presumed to have only considered relevant evidence and to be unbiased in the matter. *State v. Addison*, 10th Dist. Franklin No. 03AP-1102, 2004-Ohio-5154, ¶ 15-16. Since there was no showing of bias by the trial court in its questioning, the second assignment of error is overruled.

*Calculation of Damages*

{¶24} The final assignment of error raises the question of whether the trial court correctly calculated damages. After review of the record, this court finds that the trial court did not correctly calculate damages. First, this court notes that the sole evidence of damages was a copy of the bill submitted to JM for the repairs to the parking lot by Rhodes. However, there was no testimony as to the reasonableness of the repairs performed. Needler testified that Rhodes charged him $18,600 to repair all of the damage in the parking lot. He also testified that Rhodes had laid a foundation of stone, then put in six inches of concrete with rebar to perform the repairs. This was more than what was in the original parking lot. All of the testimony concerning the original parking lot was that it was a foundation of stone with a four-inch concrete pad with no rebar. No one testified that there had to be a six-inch pad of concrete containing rebar to repair the parking lot. While this may have been one method of repairing the damaged portions, it may not have been the only reasonable method. The trial court found that the repairs must have been

reasonable because FPE did not present any evidence to the contrary. Doc. 42 at 6. However, the burden of proving the amount of reasonable damages rests on the plaintiff, not the defendant. *Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.*, 6 Ohio St.3d 436, 453 N.E.2d 683 (1983). A defendant only has a burden of proof as to damages if defendant claims that the plaintiff failed to mitigate those damages. *Capital Equipment Ent., Inc. v. Wilson Concepts, Inc.*, 19 Ohio App.3d 233, 484 N.E.2d 237 (2d Dist. 1984). FPE presented a great deal of testimony indicating that the original parking lot only had a four-inch stone base and a four-inch concrete pad with no rebar when purchased. The fact that Rhodes chose to use a four-inch stone base and add six inches of concrete with rebar does not mean that it was actually necessary to properly repair the damage. Rhodes gave JM a parking lot with repairs better than what existed and there was no evidence presented that this was necessary.[1] Although the trial court found that this was the case, there was no evidence presented on this issue other than Needler's hearsay statement that Rhodes told him it was the best way to repair the damaged sections. This court does not dispute that this may be the best way to repair the damaged sections, but there was no testimony it was either the only way or necessary as Rhodes did not testify. The only people who testified as to how it should be repaired

---

[1] The trial court pointed to testimony by Troiana to show that the six inches of concrete was standard for sidewalks in the city which were part of a driveway. Doc. 42 at 8. However, that was not Troiana's testimony. Troiana testified that the area between the street and the sidewalk had to be six inches. Tr. 204. He also did not indicate that this six inches had to have rebar.

would be FPE's witnesses and they all testified that the method used in the original repair was appropriate. This testimony was supported by the fact that not all of the repairs failed and not all of the original parking lot was deteriorating. Thus, the trial court erred in calculating damages in a manner that put JM in a better position than they would have been if the repairs had been done in a workmanlike manner. The third assignment of error is sustained.

{¶25} Having found no error prejudicial to the appellant in the particulars assigned and argued as to the judgment of liability, that portion of the judgment is affirmed. Having found error prejudicial to the appellant in the particulars assigned and argued as to the calculation of damages, that portion of the judgment is reversed and remanded to the trial court for further proceedings in accord with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**ZIMMERMAN and SHAW, J.J, concur.**

**/hls**